**Redacted Version**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| FFTF RESTORATION COMPANY, LLC | ) | |
| Plaintiff | ) | No. 07-659<br>(Judge Firestone) |
| v. | ) | **Redacted Version** |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND CROSS MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

# TABLE OF CONTENTS


**SUMMARY** ..... 1

**FACTS** ..... 2

**STATEMENT OF THE ISSUES** ..... 9

**ARGUMENT** ..... 9

**I. Legal Standard** ..... 9

**II. Standard of Review** ..... 10

**III. The Regulatory Requirement To Conduct Business With Integrity, Fairness, And Openness Is Mandatory And Was Violated In This Instance.** ..... 11

**IV. The Regulatory Requirement To Set Aside Procurements For Exclusive Small Business Participation Is Mandatory And Was Violated In This Instance.** ..... 18

**V. The Implied-In-Fact Contract Of Good Faith And Fair Dealing, Identified By The Court of Claims Some 50 Years Ago, Has Not Been Eliminated By Statute Or The Courts.** ..... 20

**VI. Defendant's Reliance On The Passage Of ADRA For The Elimination Of This Court's Jurisdiction In This Instance Is Misplaced.** ..... 24

**VII. The Government Violated The Terms Of The Implied-In-Fact Contract Of Fair Dealing.** ..... 32

**CONCLUSION** ..... 32

**TABLE OF AUTHORITIES**

**CASE LAW**

*Aero Corp., S.A. v. United States,*
38 Fed. Cl. 739 (1997) ....................24

*Biltmore Forest Broad. FM, Inc. v. United States,*
80 Fed. Cl. 322 (2008) ....................24

*Block v. United States,*
66 Fed.Cl. 68 (2005) ....................24

*Celtech, Inc. v. United States,*
24 Cl. Ct. 269 (1991) ....................22

*Comprehensive Health Servs., Inc. v. United States,*
70 Fed. Cl. 700 (2006) ....................10, 11

*DeLaughter v. United States Postal Service,*
3 F.3d 1522 (Fed. Cir. 1993)....................13

*Dynacs Eng'g Co., Inc. v. United States,*
48 Fed. Cl. 124 (2000) ....................12

*Esch v. United States,*
77 Fed. Cl. 582 (2007) ....................9

*Folden v. United States,*
379 F.3d 1344 (Fed. Cir. 2004)....................24

*Forestry Surveys & Data v. United States,*
44 Fed. Cl. 485 (1999) ....................24

*Guillebeau v. Dep't of the Navy,*
362 F.3d 1329 (Fed. Cir. 2004)....................12, 13

*Hamilton Sundstrand Power Sys. v. United States,*
75 Fed. Cl. 512 (2007) ....................24

*Henke v. United States,*
60 F.3d 795 (Fed. Cir. 1995)....................9

*Hewitt v. Helms,*
459 U.S. 460 (1983)....................13

*Heyer Prods. Co., Inc. v. United States*,
140 F.Supp. 409 (Cl. Ct. 1956)........................................................20, 21

*Hunt Bldg. Co., Ltd. v. United States*,
61 Fed. Cl. 243 (2004)........................................................24

*HWA, Inc. v. United States*,
78 Fed. Cl. 685 (2007)........................................................24

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
238 F.3d 1324 (Fed. Cir. 2001)........................................................24

*Kawa v. United States*,
77 Fed. Cl. 294 (2007)........................................................9

*Keco Indus., Inc. v. United States*,
492 F.2d 1200 (Ct. Cl. 1974)........................................................11

*L-3 Commc'ns Integrated Sys., L.P. v. United States*,
79 Fed. Cl. 453 (2007)........................................................21, 24

*Lion Raisins, Inc. v. United States*,
52 Fed. Cl. 115 (2002)........................................................13, 14

*Lion Raisins, Inc. v. United States*,
52 Fed. Cl. 629 (2002)........................................................24

*Phoenix Air Group, Inc. v. United States*,
46 Fed. Cl. 90 (2000)........................................................24

*Prineville Sawmill Co., Inc., v. United States*,
859 F.2d 905 (Fed. Cir. 1988)........................................................11

*Reynolds v. Army & Air Force Exch. Serv.*,
846 F.2d 746 (Fed. Cir. 1988)........................................................9

*S.K.J. & Assocs., Inc. v. United States*,
67 Fed. Cl. 218 (2005)........................................................24

*Scanwell Labs., Inc.* v. *Shaffer*,
424 F.2d 859 (D.C. Cir. 1969)........................................................27, 28, 31

*Southfork Sys., Inc. v. United States*,
141 F.3d 1124 (Fed. Cir. 1998)........................................................10, 11

*Standard Mfg. Co., Inc. v. United States,*
7 Cl. Ct. 54 (1984) ....................................................................................21

*Unified Architecture & Eng'g, Inc. v. United States,*
46 Fed. Cl. 56 (2000), *aff'd*, 251 F.3d 170 (Fed. Cir. 2000)................................24

*United States v. The Donruss Co.,*
393 U.S. 297 (1969)....................................................................................26

*Wetsel-Oviatt Lumber Co., Inc. v. United States,*
40 Fed. Cl. 557 (1998) ..................................................................................24

**<u>STATUTES AND REGULATIONS</u>**

5 U.S.C. § 706...........................................................................................10

28 U.S.C. § 1491(a)(1).................................................................................31

28 U.S.C. § 1491(b)(1) ................................................................................10

48 C.F.R. § 1.102 ......................................................................10, 11, 12, 14, 18

48 C.F.R. § 1.108(f)....................................................................................13

48 C.F.R. § 2.101 .......................................................................................13

48 C.F.R. § 19.502-2...........................................................................2, 10, 18, 19

48 C.F.R. § 19.506 ......................................................................................19

**<u>OTHER</u>**

*Administrative Dispute Resolution Act of 1996*, Pub. L. 104-320, 110 Stat. 3870 (1996) ....
...............................................................................................13, 24, 26

142 Cong. Rec. S6155, 1996 WL 315422 (June 12, 1996) ............................27, 28, 30, 31

H.R. Rep. No. 104-841 (1996).........................................................................31

RCFC 12(b)(1) ...............................................................................................1

RCFC 52.1 ................................................................................................1, 31

**Redacted Version**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| FFTF RESTORATION COMPANY, LLC | ) | |
| Plaintiff | ) | No. 07-659<br>(Judge Firestone) |
| v. | ) | **Redacted Version** |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND CROSS MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Plaintiff FFTF Restoration Company, LLC ("Plaintiff" or "FRC") hereby respectfully submits its Opposition to the Defendant's Motion to Dismiss and For Judgment Upon The Administrative Record And Cross Motion for Judgment Upon The Administrative Record ("Def. Mot.") pursuant to Rule 12(b)(1) and Rule 52.1 of the Rules of the Court of Federal Claims.

**SUMMARY**

Defendant would have this Court characterize this matter simply as FRC's challenge of "the Department of Energy's ("DOE's") decision to cancel Solicitation No. DE-RP06-04RL14600, for deactivation and decommissioning ["D&D"] of the fast flux test reactor ("FFTF") at the Hanford Nuclear Reservation in Richland, Washington." Def. Mot. at 1. However, FRC is actually challenging the cancellation of the small-business set-aside solicitation while DOE continues to pay for performance by a large business contractor—a cancellation decision that violated mandatory procurement regulations while lacking a rational basis and was a breach of DOE's implied-in-fact

contract with FRC that it would treat FRC fairly and honestly. This would be a different case if DOE had simply cancelled the solicitation and stopped all performance required by the solicitation. It did not. Rather DOE spent an additional $90 million after the cancellation notice—an amount that will continue to increase each year.

**FACTS**

Based on the administrative record ("AR") produced by defendant and the uncontested facts submitted by FRC, the following facts are known.

1. DOE developed a strategy "to implement the entire FFTF Closure Project through a small business set aside acquisition." AR 3. This strategy was consistent with the mandatory requirements of Federal Acquisition Regulations ("FAR"), 48 C.F.R. § 19.502-2, that *requires* a contracting officer to set aside an individual acquisition for exclusive small business participation when there is a reasonable expectation of receiving offers from two or more responsible small business concerns and award can be made at a fair and reasonable price—both factors that were present in this case with DOE establishing a competitive range of three small business offerors, all of which offered prices that were well under the government cost estimate. AR Exhibit D at ES-1-2.

2. "The scope of the solicitation included both the ongoing deactivation as well as any decommissioning of the FFTF." AR 3. The amended solicitation separated the deactivation requirements and the decommissioning requirements into two separate line items. AR Exhibit D at ES-1.

3. FRC was fully qualified to do all of the work having been evaluated as [redacted] in "Technical Approach, Key Personnel, and Business Management" and [redacted] in " Experience" and "Past Performance." AR Exhibit D at ES-4.

4. The December 16, 2005, memorandum from DOE's Source Selection Official and related material that was used to recommend cancellation of the solicitation identifies five factors used to justify DOE's decision to cancel the small business set-aside solicitation:

I. Delays.

"[T]he acquisition has encountered several delays, including a successful protest of the initial award." AR 1.

II. Reduced Budget.

"During recent weeks, the Administration has made decisions that result in significantly reduced funding for Environmental Management (EM) projects." AR 1. The DOE budget request to Congress for FY 2006 for all of EM was $6,505,476,000 which compared to a FY 2005 appropriation of $7,053,640,000 and a FY 2004 appropriation of $6,752,870,000. Page 7 of Department of Energy FY 2006 Congressional Budget Request, available at http://www.mbe.doe.gov/budget/06budget/Content/Volumes/Vol_5_EM.pdf, reproduced at Attachment 1 for the convenience of the Court. The FY 2007 request for all of EM was $5,828,038. Page 7 of Department of Energy FY 2007 Congressional Budget Request, available at http://www.mbe.doe.gov/budget/07budget/Content/Volumes/Vol_5_EM.pdf, reproduced at Attachment 2 for the convenience of the Court.

III. Federal, state and local stakeholders' concerns.

"[F]ederal, state and local stakeholders have urged DOE to devote the limited funds available for environmental work at Hanford to projects which are seen to pose

higher environmental hazards than FFTF. Therefore, DOE will need to shift funding from FFTF to higher priority EM projects. Consequently, deactivation and decommissioning work needs to be redefined downward to accommodate budgetary constraints." AR 1.

IV. Postponement of Record of Decision on the EIS with regard to CLIN 2.

"[D]ue to the inevitable postponement of a record of decision (ROD) for an environmental impact statement (EIS) with is a precondition for work on one of two major contract line item numbers (CLINs) in this project, DOE will not be able to meet the date set in the solicitation for a decision on that CLIN. As a result, if the procurement proceeds, DOE will need to amend the solicitation and allow additional time for submission of new proposals." AR 1.

V. Procurement will not be cost effective due to incumbent contractor continuing performance.

"Finally, an incumbent contractor has been working on the deactivation of the FFTF throughout this procurement. Consequently, the monetary value of this award diminishes each day that it is not awarded. With the most recent known delays in this acquisition, the residual work scope (CLIN 1) and period of performance is likely to be so small as not be cost effective, either for the awardee or the Government." AR 2.

5. With regard to Cancellation Reason I – Delays – the solicitation process was delayed, in part, not by any improper or unreasonable action of FRC (or any other offeror) but by DOE's failure to comply with mandatory procurement regulations. Instead of taking corrective action when a valid bid protest was timely filed in October 2004, DOE litigated the protest to a final decision on January 2006. AR 9. DOE finally issued a revised solicitation in April 2005. AR 9.

6. With regard to Cancellation Reason II – Reduced Budget – DOE has, in fact, spent $90,046,000 since the cancellation decision on solicitation services. According to DOE budget documents, in FY 2006, DOE spent $45,652,000 on "Fast Flux Test Reactor Facility D&D." Attachment 2, at page 6. (The incumbent large business contractor had a spend rate of $3.8 million per month (AR 3) so that the total amount spent after the cancellation decision on December 23, 2005 was $34.2 million.)[1] In FY 2007, DOE spent $34,843,000. Page 12 of Department of Energy FY 2009 Congressional Budget Request available at http://www.mbe.doe.gov/budget/09budget/Content/Volumes/Volume5.pdf, reproduced at Attachment 3 for the convenience of the Court. In FY 2008, DOE spent $10,248,000. *Id.* For FY 2009, DOE has requested a budget amount of $10,755,000. *Id.*

Furthermore, of critical importance is the fact that the "FFTF Options" chart, utilized by DOE officials to apparently evaluate and support a cancellation decision, was based on "Annual Funding" for the "Incumbent Contractor" of just "$2-3" million rather than the $22.5 million that has been the annual average since the cancellation decision. AR 12. This means that DOE officials based their cancellation decision on clearly erroneous information.

7. With regard to Cancellation Reason III – Federal, state and local stakeholders' concerns – the Inspector General for DOE issued a report in March 2005 (AR Exhibit 2) in which he stated:

> The decommissioning of the FFTF may not represent the highest risk and environmental priority at Hanford. In January 2005, the U.S. Environmental Protection Agency (EPA) and the Washington State Department of Ecology (Ecology) requested that the Department consider deferring portions of the work

[1] In plaintiff's previous filing, it erroneously included DOE expenditures in FY 2005.

> to decommission the FFTF because of higher priority cleanup projects at Hanford. . . . These organizations have recommended that tight cleanup budgets be shifted to higher priority cleanup projects."

AR Exhibit A at 2.

On May 2, 2005, the Principal Deputy Assistant Secretary for Environmental Management at DOE responded to the Inspector General's concerns in part by stating: "[w]e have discussed these changes with our Hanford Site regulators – U.S. Environmental Protection Agency and State of Washington Department of Ecology – and they indicated that our approach addresses their concerns." AR Exhibit B at 2. Having addressed the concerns of EPA and Washington State, DOE issued a revised solicitation on April 29, 2005 that encouraged offerors, including FRC, to continue to expend resources to seek award of a contract to perform the services that ultimately were performed by a large business contractor. AR Exhibit D at 8.

8. With regard to Cancellation Reason IV – Postponement of Record of Decision on the EIS with regard to CLIN 2 – the Inspector General stated:

> The final end state of the FFTF is uncertain and changes to the planned end state could lead to increased costs. In the Department's Request for Proposals, it required bidders to price their proposals assuming an end state of entombment for FFTF. . . . However, the Department has not yet determined an approved, final end state for FFTF because it has not completed an environmental impact statement. . . . Department officials told us that the work necessary to entomb the reactor would also have to be completed even if the Policy Act process results in demolition being selected as the final end state. Accordingly, they believed it was appropriate to proceed with a contract that included a scope of work for future decommissioning of the FFTF before completing the Policy Act process. However, Department officials acknowledged to the Office of Inspector General that the alternative end state of completely demolishing and removing the reactor building would require a contract renegotiation. . . . The Department expects to complete the environmental impact assessment by August 2005."

AR Exhibit A at 2.

The Principal Deputy Assistant Secretary for Environmental Management at DOE responded to the Inspector General's concerns in part by stating:

> We have structured the RFP such that only the deactivation SOW is authorized for immediate execution with a decision point after the issuance of a Record of Decision under the NEPA process that will determine what the end state will be for this facility. This contractual decision point allows the Department to either proceed as described in the RFP with entombment of the reactor, modify the contract consistent with a removal end state decision (or other end state decision), *or end the contract at the completion of deactivation*. . . . This decision point also allows us to consider other factors such as the Hanford Site budget and cleanup priorities at that time (the issue raised by the State of Washington and the Environmental Protection Agency) before committing to the final decommissioning phase of this project. . . .
>
> We have discussed these changes with our Hanford Site regulators—U.S. Environmental Protection Agency and State of Washington Department of Ecology—an they indicated that our approach addresses their concerns."

Emphasis added; AR Exhibit B at 1.

The solicitation clearly provided that an amendment would possibly be negotiated after award if "complete removal or another alternative were chosen as the end-state" (the decommissioning part of the statement of work). AR 3. Having redrafted the solicitation so that it could end with completion of CLIN 1, the deactivation work, DOE encouraged FRC to continue to expend resources to seek award of a contract for services that were ultimately performed and are being performed by a large business.

9. With regard to Cancellation Reason V – Procurement will not be cost effective due to incumbent contractor continuing performance – the government's independent cost estimate was approximately $350 million (AR 3) which, although not stated in the record, would have been based on the current expenditure rate of the incumbent, large business contractor. Each of the three small business offerors offered

prices that were significantly under that large business rate with evaluated prices of [redacted] million, [redacted] million, and [redacted] million. AR Exhibit D at ES-2.

10. Nothing in the administrative record supports the conclusion that it would be cost effective to DOE and the taxpayer to have the incumbent large business contractor continue performance. There are no calculations, no estimates, no figures.

Therefore, there is no factual rational basis for the cancellation decision that is supported by the administrative record.

11. Other facts that are relevant include the fact that on February 17, 2004, FRC submitted a 350-page compliant offer. Amended Complaint ("Am. Comp.") at 5. After government audits, other reviews, and discussions, FRC prepared and submitted a revised offer on June 25, 2004. FRC invested 17,742 person hours in preparing its offer through June 25, 2004 at a total cost of $2,524,398. Am. Comp. at 5.

12. On September 27, 2004, DOE awarded a contract to another small business, SEC Closure Alliance, LLC. That award, following a protest filed by FRC at the Government Accountability Office, was determined to be in violation of procurement law and the contract was terminated. Exhibit D at ES-1. FRC invested $719,935 in not only pursuing the protest but reforming the team necessary to continue to respond to DOE's revised solicitation. Am. Comp. at 6.

13. On April 29, 2005, DOE, having previously indicated to FRC that an amended solicitation would be forthcoming, issued an amended solicitation. Exhibit D at 7. The amended solicitation reduced the scope of work by just 16 percent and on June 6, 2005, FRC submitted a revised proposal based on its prior proposal. Am. Comp. at 7. After discussions and another solicitation amendment as well as exchanges, DOE

announced that final proposal revisions would be requested around December 1, 2005. Am. Comp. at 7. FRC invested an additional $836,772 in responding to the amended solicitation. Am. Comp. at 8. DOE did not request final proposal revisions but rather cancelled the entire solicitation on December 22, 2005 (AR 17) and refused to provide Plaintiff with a debriefing with regard to the cancellation.

## **STATEMENT OF THE ISSUES**

Whether the Court of Federal Claims has jurisdiction over this matter.

Whether FRC is entitled to its bid and proposal costs as damages resulting from the decision to cancel the solicitation which lacked a rational basis and from the breach by DOE of its obligation to deal with FRC fairly and honestly.

## **ARGUMENT**

### I. **Legal Standard**

"Tucker Act jurisdiction is conferred upon this Court when a party alleges an implied contract with the United States." *Kawa v. United States*, 77 Fed. Cl. 294, 303 (2007). When subject matter jurisdiction is challenged, the plaintiff must establish jurisdiction by a preponderance of the evidence. *Esch v. United States*, 77 Fed. Cl. 582, 587 (2007), *citing*, *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). In determining whether or not the Court of Federal Claims has subject matter jurisdiction over an action, the court will "assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). FRC has alleged the elements of a valid implied-in-fact contract in its Amended Complaint.

In addition, FRC has invoked the Court's jurisdiction pursuant to 28 U.S.C. § 1491(b)(1) by alleging a violation of mandatory regulations to "conduct business with integrity, fairness, and openness" (FAR, 48 C.F.R. § 1.102) and a violation of mandatory regulations requiring contracting officers to set aside solicitations for small business concerns (FAR, 48 C.F.R. § 19.502-2).

**II. <u>Standard of Review</u>**

Defendant argues two standards of review in its Motion. First, defendant correctly states (Def. Mot. at 9), that for actions under 28 U.S.C. § 1491(b)(1), the Court is to use the standards of section 706 of title 5 of the United States Code which is, of course, a review of whether an agency decision lacked a rational basis or was otherwise arbitrary and capricious. ("The reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law . . . ."

Defendant also argues the need for FRC to prove "bad faith" with regard to its implied-in-fact contract breach claim. Def. Mot. at 22. FRC's Count III alleges defendant's breach of its implied-in-fact to deal with FRC fairly and honestly, and FRC need only demonstrate that the government acted "in an arbitrary, capricious or irrational manner." *Comprehensive Health Servs., Inc. v. United States*, 70 Fed. Cl. 700, 738 (2006); *citing*, *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed. Cir. 1998)("The government is said to breach the implied contract if its consideration of

offers is found to be arbitrary and capricious toward the bidder-claimant." (citation omitted)).

In determining whether the government breached its implied contract, courts look to four factors laid out in *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1203-04 (Ct. Cl. 1974):

> The predecessor court to the United States Court of Appeals for the Federal Circuit identified four relevant factors to help a trial court determine if a breach of the duty of good faith and fair dealing has occurred: 1) absence of a reasonable basis for the administrative decision; 2) the amount of discretion afforded to the procurement officials by applicable statutes and regulation; 3) proven violations of pertinent statutes or regulations; and 4) subjective bad faith.

*Comprehensive Health Servs.*, 70 Fed. Cl. at 738 (2006) (holding that bad faith was proper standard when the other three *Keco* factors do not support a finding of breach). The Court of Appeals for the Federal Circuit more recently clarified that all four factors do not need to be present to find that the government breached its duty. *Comprehensive Health Servs.*, 70 Fed. Cl. at 738 (2006); *citing*, *Prineville Sawmill Co., Inc., v. United States*, 859 F.2d 905, 911 (Fed. Cir. 1988)("Accordingly, we note that the absence of any allegation of bad faith on the part of the Forest Service in rejecting Prineville's bid and cancelling the South Crater auction is not determinative."). Defendant wants the Court to impose the high standard of well-nigh irrefragable proof required to demonstrate bad faith, even though it is sufficient for FRC to demonstrate that the agency's actions violated statute or regulation or that they lacked a reasonable basis.

## III. The Regulatory Requirement To Conduct Business With Integrity, Fairness, And Openness Is Mandatory And Was Violated In This Instance.

### A. The Regulatory Requirement To Conduct Business With Integrity, Fairness, And Openness Is Mandatory.

Defendant argues that because the title for FAR Section 1.102 includes the words "guiding principles," the Court must conclude that the entire section is "aspirational" and

therefore "imposes no clear duty necessary to determine a violation." Def. Mot. at 12-13. Defendant's argument fails for two reasons. First, FAR 1.102(b) clearly states that "[t]he Federal Acquisition System *will*—(3) Conduct business with integrity, fairness, and openness…." Emphasis added. "The FAR *requires* 'integrity, fairness and openness; in procurements conducted under the Federal Acquisition System." *Dynacs Eng'g Co., Inc. v. United States*, 48 Fed. Cl. 124, 131 (2000) (granting plaintiff relief where agency reopened discussions with another offeror but not with plaintiff). Emphasis added. Further support for the mandatory nature of FAR 1.102(b) is found in subsection 1.102-2(c) which states in relevant part that "the actions of each member of the Team *must* reflect integrity, fairness, and openness….[E]ach member of the Team is responsible and accountable for the wise use of public resources as well as acting in a manner which maintains the public's trust. Fairness and openness require open communication among team members, internal and external customers, and the public." Emphasis added; FAR 1.102-2(c)(1). The subsection also clearly states that: "[a]ll contractors and prospective contractors *shall be* treated fairly and impartially but need not be treated the same." Emphasis added; FAR 1.102-2(c)(3). In each instance, the FAR *requires* integrity, fairness, and openness of federal acquisition officials.

The use of the word "will" denotes a *mandatory requirement* of the Federal Acquisition System.[2] "Similarly, the use of the word "must" in FAR 1.102-2(c)(1) also

---

[2] For example, the Court of Appeals for the Federal Circuit determined that where a Merit Systems Protection Board ("MSPB") regulation stated, "Failure of the agency to submit evidence that it has complied with the granting of interim relief . . ., or that it has provided notification that interim relief will not be granted fully . . ., *will result in the dismissal of the agency's petition or cross petition for review*," the word "will" imposed a mandatory requirement on the Board to dismiss an agency's petition under those circumstances. The Board subsequently amended its regulations to replace "will" with

imposes mandatory requirements on the government officials implementing the Federal Acquisition System. FAR 2.101, Definitions of Words and Terms, includes an entry for "must" which cross-references to "shall": "Must (see 'shall') . . . Shall means the imperative."[3]

Furthermore, FAR 1.108(f) states with regard to "Imperative sentences" that "[w]hen an imperative sentence directs action, the contracting officer is responsible for the action, unless another party is expressly cited." Because "must" means the imperative, the contracting officer for this solicitation and cancellation was responsible for acting with integrity, fairness and openness.

Defendant's argument must also fail because what it suggests is that federal acquisition officials have the discretion to choose whether or not to act with integrity, fairness, and openness. These are not regulations that provide "guidelines" for the imposition of appropriate bond coverage or for the selection of contract type or for any other type of discretionary action as is the case with the cases cited by defendant. Def. Mot. at 13-15. Rather, they are absolute requirements that, when violated to the detriment of a prospective contractor such as FRC, provide jurisdiction in this Court and an appropriate remedy.[4]

---

"may" to eliminate the mandatory dismissal requirement and make the Board's dismissal determinations discretionary. (Emphasis in original). *Guillebeau v. Dep't of the Navy*, 362 F.3d 1329, 1332-33 (Fed. Cir. 2004); *see also*, *DeLaughter v. United States Postal Service*, 3 F.3d 1522 (Fed. Cir. 1993).

3 *See also Hewitt v. Helms*, 459 U.S. 460, 472 (1983) ("shall," "will," and "must" are "language of an unmistakably mandatory character").

4 Indeed, defendant, by citing in its argument that the Administrative Dispute Resolution Act of 1996, Pub. L. 104-320, 110 Stat. 3870 (1996) ("ADRA") "'encompasses all claims that could have been brought under the former statute and

Because FAR 1.102 contains mandatory regulations, the violation of which has been alleged by FRC, this Court has clear jurisdiction over this matter.

### B. <u>The Regulatory Requirement To Conduct Business With Integrity, Fairness, And Openness Was Violated By DOE.</u>

As detailed in the facts cited from the administrative record, FRC was not treated with integrity, fairness, and openness in this instance when DOE induced it to pursue a contract award and then decided to cancel the solicitation without a rational basis while continuing to obtain the solicited services from a large business contractor. As noted, DOE cited to five factors to support the basis to cancel the solicitation after encouraging FRC to invest its limited resources as a small business concern to pursue an award of a contract over a period of two full years. However, none of those five reasons had a rational basis, with the result that the cancellation decision was arbitrary and capricious.

First, the delay cited by DOE was the result of violations of federal procurement law as determined by the Government Accountability Office. The agency cannot now simply declare that because it was delayed by its own violations that it is able to cancel a small business set-aside solicitation and continue performance with a large business contractor. Such an action punishes the small business for not only pursuing its legal rights but for proving a violation while rewarding a large business concern on an acquisition that had been determined to be appropriate for small business concerns. Furthermore, it is self-evident that DOE knew at the time that it issued the amended solicitation in April 2005 that the process had been delayed as a result of the successful

---

more….'", (Def. Mot. at 18; citing *Lion Raisins, Inc. v. United States*, 52 Fed. Cl. 115, 120 (2002)), defendant concedes that fair and equitable treatment of prospective contractors is a requirement of federal acquisition officials and not merely a discretionary function that would not be actionable.

protest, yet DOE chose to proceed. It cannot rationally decide at a later date that the protest delay permits a cancellation and continued performance by the incumbent.

Second, although it is apparently a fact that the Environmental Management ("EM") budget for DOE was reduced from $6.5 billion in FY 2006 to $5.8 billion for FY 2007, the fact remains that a possible reduction in the overall EM budget was not reasonably a surprise to anyone given the then-current world circumstances and status of discussions on the federal budget that occurred throughout calendar year 2005—all occurring while DOE was making the decision to continue the solicitation process in May 2005. Furthermore, it is a fact that DOE spent an additional $34.2 million in FY 2006 which had already been appropriated by Congress and an additional $34,843,000 in FY 2007 on FFTF D&D rather than the $1 to $2 million used as a basis for decision to continue performance with the large business incumbent. There is nothing in the decision document that rationally ties a reduction in the overall EM budget to a justification to simply replace the small business set-aside contract with continued performance by the incumbent.

Third, the Principal Deputy Assistant Secretary for Environmental Management had confirmed to the Inspector General in May 2005 that the concerns of State of Washington and Environmental Protection Agency had been addressed by the fact that the solicitation had been amended so that all offerors were fully aware that only CLIN 1, the deactivation stage, might be funded and performed. DOE officals could not then rationally argue that the concerns expressed by those stakeholders in January 2005 which were addressed and satisfied with the release of the April 29, 2005 amended solicitation

could form a rational basis for the decision to cancel the solicitation at issue in December 2006.

Fourth, DOE states that a new delay in an environmental impact statement that was apparently necessary in order to exercise the decommissioning option of the contract somehow rationally justified the cancellation of the solicitation. Based on the administrative record presented to this Court, there is nothing that explains the stated but unsupported concerns as to why an amended solicitation would be necessary or the length of time such an amended solicitation would consume. Furthermore, DOE had informed the Inspector General that an EIS would be done in August 2005 (AR Exhibit A at 2), so when August 2005 came and went and no EIS was completed, DOE was on notice of an apparent change in circumstances at that time. DOE had further informed the Inspector General that the solicitation provided notice to the offerors that the awarded contract could be modified or even ended prior to deactivation depending upon the outcome of an eventual EIS. AR Exhibit B at 1. To then state in December 2005 that an expected delay in the EIS was cause for cancellation lacks any rational basis and is arbitrary and capricious.

Finally – and perhaps most importantly, given the fact that the other cited factors lack any rational basis for the cancellation decision announced in December 2005 after the decision to proceed in April 2005 – is the alleged factor that "the residual work scope (CLIN 1) and period of performance is likely to be so small as not be cost effective, either for the awardee or the Government." Again, the administrative record provided to this Court contains no actual cost analysis to justify this reason. Indeed, it is almost a certainty that had DOE properly awarded even a $90 million contract to FRC or any of

the other small business concerns, this case never would have been brought. What is clear is that the small business concerns were, in fact, more cost-effective in their fixed price proposals than the large business contractor – given a comparison between the government estimate and actual prices offered – 350 million versus a maximum of [redacted] million. While it may have been more administratively convenient for DOE to simply cancel the solicitation rather than seek competition among small business concerns, there is nothing in the record that supports the factor that it was somehow more cost-effective. Even though defendant argues that DOE weighed the "costs and benefits of various courses of action . . ." (Def. Mot. at 22), what the administrative record actually shows is that DOE weighed the "pros" and "cons" of its decision (AR 12-15) rather than the actual costs. Given the fact that small business concerns in this instance were considerably less expensive than the incumbent large business contractor, and given the acknowledged budget restraints, the best interests of the government would have been served by an award to a small business – a result that had been previously determined when the solicitation process was started in 2003.

Every offeror that is induced to invest resources to submit an offer to perform services for the government is entitled to fair and honest treatment by government officials. That fair and honest treatment by the government includes making procurement decisions that have a rational basis and are not arbitrary and capricious. This did not happen here.

Defendant argues that "the record makes clear that DOE did not begin to consider cancellation of the solicitation until learning of the loss of 16 percent of its FY 2006 funding in November 2005 – only one month into FY 2006 and only one month before

the challenged cancellation." Def. Mot. at 21-22. Defendant goes on to state that "[i]t was not until November 2005 that the agency learned that it would lack sufficient funding for FFTF *decommissioning* activities." Emphasis added; Def. Mot. at 22. However, the evidence is clear that DOE has spent $90 million through the incumbent large business contractor on deactivation activities since the cancellation decision. The record is also clear that DOE officials understood that the amended solicitation was drafted in such a way as to permit DOE to not exercise the decommissioning activities under CLIN 2. AR Exhibit D at ES-1. Furthermore, the evidence proffered by defendant that cancellation was not considered until November 2005 because the source selection committee was continuing to write its report on the evaluations is not evidence that the cancellation decision was rationally based – only that it was written after the source selection committee did its work.

The final piece of evidence is DOE's refusal, in December 2005, to provide FRC or any of the other offerors a debriefing or explanation as to the basis for the cancellation decision other than the one-page letter received by each on December 22, 2005.

## IV. The Regulatory Requirement To Set Aside Procurements For Exclusive Small Business Participation Is Mandatory And Was Violated In This Instance.

### A. The Regulatory Requirement To Set Aside Procurements For Exclusive Small Business Participation Is Mandatory.

As is the case with FAR 1.102, FAR 19.502-2(b) contains mandatory language. "The contracting officer shall set aside any acquisition over $100,000 for small business participation when there is a reasonable expectation that—(1) offers will be obtained from at least two responsible small business concerns…; and (2) award will be made at fair market prices." As stated in the administrative record, DOE concluded at the very

beginning of the acquisition process that the services required were appropriately acquired "through a small business set aside acquisition." AR 3. Section 19.506 of the FAR deals with withdrawals of small business set-asides and requires the contracting officer to give notice to the "agency small business specialist and the SBA procurement center representative . . . stating the reasons." The administrative record provides no indication that this mandatory regulation was followed.

### B. The Regulatory Requirement To Set Aside Procurements For Exclusive Small Business Participation Is Mandatory And Was Violated In This Instance.

The violation in this instance is clear. DOE had early on concluded that the required services were appropriate for exclusive small business participation. That conclusion was proven correct when three small business concerns, including FRC, submitted compliant offers at fair market prices, especially when those prices are compared to the large business contractor rates. We again arrive at the same conclusion—had DOE officials simply cancelled the solicitation and cancelled the required services, it is likely this matter would have never arisen. They did not. Having taken the small business concerns through a tortuous and expensive two-year solicitation process, DOE decided to continue purchasing the needed services from a large business concern at prices above fair market prices as determined by the competition among small business concerns, and without taking the administrative actions for review by the proper small business officials.

Operating a procurement system with integrity, fairness, and openness means that DOE must do what it says it is going to do and what the FAR requires it to do, such as set aside solicitations for small businesses, as required by FAR 19.502-2(b), unless it has a

rational basis to alter course. In this instance, no such basis has been provided in the administrative record.

## V. The Implied-In-Fact Contract Of Good Faith And Fair Dealing, Identified By The Court of Claims Some 50 Years Ago, Has Not Been Eliminated By Statute Or The Courts.

At least as far back as 50 years ago, the courts, in construing a 1919 Supreme Court case, have recognized that when the government enters into the commercial marketplace in order to procure goods and services, an implied-in-fact contract is created between the government and the offerors who would seek to do business with the government. The terms of that implied-in-fact contract include the government's promise to consider submitted offers fairly and honestly. In *Heyer Prods. Co., Inc. v. United States,* 140 F.Supp. 409 (Ct. Cl. 1956), this Court's predecessor, when presented with a complaint that alleged that the government had no reasonable basis for the procurement decision it made, stated:

> It was an implied condition of the request for offers that each of them would be honestly considered, and that that offer which in the honest opinion of the contracting officer was most advantageous to the Government would be accepted. No person would have bid at all if he had known that 'the cards were stacked against him.' No bidder would have put out $7,000 in preparing its bid, as plaintiff says it did, if it had known the Ordnance Department had already determined to give the contract to the Weidenhoff Company. It would not have put in a bid unless it thought it was to be honestly considered. It had a right to think it would be. The Ordnance Department impliedly promised plaintiff it would be. This is what induced it to spend its money to prepare its bid.
>
> That promise was broken, shamefully broken, if plaintiff's petition states the facts. If the facts there stated are true, the conclusion seems inescapable that the Ordnance Department knew from the beginning they were going to give Weidenhoff the contract. The advertisement for bids was a sham, done only to appear to comply with the law, to clothe their apparently dishonest purpose with the habiliments of legality. If these allegations are true, they practiced a fraud on plaintiff and on all other innocent bidders. They induced them to spend their money to prepare their bids on the false representation that their bids would be honestly considered.

> This implied contract has been broken, and plaintiff may maintain an action for damages for its breach.

*Heyer Prods. Co.*, 140 F. Supp. at 412-413. And more recently, this Court has stated:

> Before enactment of the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104-320, 110 Stat. 3870 (1996) (ADRA), the Court of Federal Claims' jurisdiction over a bid protest was predicated on the implied contract between the Government and prospective bidders to treat the bidder's proposal fairly, equally, and consistently with the agency's solicitation of bids. *Keco Indus., Inc. v. United States*, 192 Ct. Cl. 773, 780 (1970); *Heyer Prods. Co. v. United States*, 147 Ct. Cl. 256, 177 F. Supp. 251, 252 (1959) ("If in the instant case the [agency], in rejecting plaintiff's bid, did not act in good faith, but arbitrarily and capriciously, it breached its implied promise when it solicited bids, for the breach of which plaintiff may recover the expenses it had incurred in submitting its bid."). Although ADRA obviated the need to base the COFC's protest jurisdiction on a breach of this implied-in-fact contract to consider bids fairly, the statute in no way eliminated a protestor's ability to challenge arbitrary and capricious conduct, such as bias or an unfair evaluation, which would also constitute a breach of the implied contract of fair dealing. *See*, *e.g.*, *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 273 (2004); *Unified Architecture & Eng'g, Inc.*, 46 Fed. Cl. 56, 60-61, aff'd, 251 F.3d 170 (Fed. Cir. 2000). Section 1491(b) expressly provides that this Court has jurisdiction over "an action by an interested party objecting . . . to the award of a contract." 28 U.S.C. § 1491(b) (2000). The statute does not limit the legal theories on which such an "objection" to a contract award might be based. Whether conduct be characterized as an arbitrary and capricious agency action or a breach of the implied duty to consider proposals fairly, such conduct is actionable in a bid protest.

*L-3 Commc'ns Integrated Sys., L.P. v. United States,* 79 Fed. Cl. 453 (2007) (footnote omitted).

In between *Heyer* and *L-3 Commc'ns Integrated Sys., L.P.*, this Court has repeatedly found that its jurisdiction covered the implied-in-fact contract with regard to the solicitation process engaged in by the government as well as describing its various terms. In *Standard Mfg. Co., Inc. v. United States*, 7 Cl.Ct. 54, 58-59 (1984), the Court stated:

> The essence of Heyer Products Co., Inc. v. United States, 135 Ct.Cl. 63, 140 F.Supp. 409 (1956), and its progeny is that, when defendant invites prospective

> contractors to respond to a request for offers to supply government procurement needs, the invitation is accompanied by the implied condition that each response will be "honestly considered," Heyer Products, 135 Ct.Cl. at 69, 140 F.Supp. 409. If the government is to be "given the benefit of the competition of the market," "each bidder is given the chance for a bargain," and the invitation necessarily gives rights to, and imposes obligations upon, both the issuer of the invitation and the bidder who responds to it. Id., 135 Ct.Cl. at 70, 140 F.Supp. 409 (quoting from United States v. Purcell Envelope Co., 249 U.S. 313, 39 S.Ct. 300, 63 L.Ed. 620 (1919).

Similarly, this Court has stated in *Celtech, Inc. v. United States*, 24 Cl. Ct. 269, 273-274 (1991):

> . . . Heyer stated a broad general rule which is that every bidder has the right to have his bid honestly considered by the Government, and if this obligation is breached, ... the injured party has the right to come into court to try and prove his cause of action." *Keco Industries, Inc. v. United States*, 192 Ct.Cl. 773, 780, 428 F.2d 1233, 1237 (1970) ("*Keco I*" ). *Keco I* confirmed that "any party who can make a prima facie showing of arbitrary and capricious action on the part of the Government in the handling of a bid situation [has] standing to sue." Id. 192 Ct.Cl. at 779, 428 F.2d at 1237.
>
> *Keco Industries, Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200 (1974) ("Keco II" ), stated that the "ultimate standard" for assessing fair and honest consideration is "whether the Government's conduct was arbitrary or capricious toward the bidder-claimant." *Keco II*, 203 Ct.Cl. at 574, 492 F.2d at 1203. *Keco II* identified four general principles that control all or some of these claims: (1) subjective bad faith on the part of procuring officials; (2) lack of any reasonable basis for the administrative decision; (3) degree of discretion that applicable statutes and regulations give to procurement officials; and, possibly, (4) proof that pertinent statutes or regulations were violated. Id. at 574, 492 F.2d at 1203-04. The court added that "[t]he application of these four general principles may well depend on (1) the type of error or dereliction committed by the Government, and (2) whether the error or dereliction occurred with respect to the claimant's own bid or that of a competitor." Id. at 574, 492 F.2d at 1204.
>
> *   *   *
>
> Arbitrary and capricious behavior encompasses more than favoritism or discrimination between competing bidders. The principles enunciated in *Keco II* embrace conduct such as bad faith, failure to make decisions on a rational basis, and violation of pertinent statutes and regulations, which may occur in either competitive or non-competitive situations.

In this instance, DOE induced FRC to bid and to continue to expend money on the revision of its offer. In turn, when it came time to award the contract, DOE officials relied on unreasonable factors, or factors that had already been considered and addressed, to not award the contract while continuing to purchase the needed services from a large business contractor. Rather than giving FRC the opportunity to earn back some of its investment by performing the services for which it was well-qualified and offered a more reasonable price than the large business contractor, DOE choose instead to simply stay the course to the extreme detriment of FRC. There is no other explanation for the government's action in this instance. This is not a case where the need for the services was eliminated by a change in technical circumstances – the government continued to purchase the needed services from a large business concern. This is not a case where Congress denied money for the needed services – the services continued at a price higher than offered by the small business offeror. This is not a case where the government properly rejected plaintiff's proposal because it was materially deficient in some manner. Rather, this is a case where DOE, apparently for its own administrative convenience and contrary to the best interest of the public, chose to discontinue a procurement while at the same time encouraging its small business competitors, including Plaintiff, to continue to expend money on preparing proposals and revised proposals. This court has jurisdiction to determine whether there was an actual breach of the contract created when the government requested offers to its solicitation and the amount of damages incurred as a result of the breach of that contract created.

## VI. Defendant's Reliance On The Passage Of ADRA For The Elimination Of This Court's Jurisdiction In This Instance Is Misplaced.

Defendant cites to a number of cases of this Court in support of its proposition that ADRA eliminated this court's jurisdiction over implied-in-fact contracts. *See Block v. United States*, 66 Fed.Cl. 68, 76 (2005); *S.K.J. & Assocs., Inc. v. United States*, 67 Fed. Cl. 218 (2005); *Lion Raisins, Inc. v. United States*, 52 Fed. Cl. 629 (2002). There are, of course, a number of recent decisions that arrive at a different conclusion. *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 739 (1997); *Biltmore Forest Broad. FM, Inc. v. United States*, 80 Fed. Cl. 322 (2008)(citing *Folden v. United States*, 379 F.3d 1344 (Fed. Cir. 2004); *Forestry Surveys & Data v. United States*, 44 Fed. Cl. 485 (1999); *Hamilton Sundstrand Power Sys. v. United States*, 75 Fed. Cl. 512 (2007); *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 273 (2004); *HWA, Inc. v. United States*, 78 Fed. Cl. 685 (2007); *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 79 Fed. Cl. 453 (2007); *Phoenix Air Group v. United States*, 46 Fed. Cl. 90, 100 (2000); *Unified Architecture & Eng'g, Inc. v. United States*, 46 Fed. Cl. 56, 60-61 (2000), *aff'd*, 251 F.3d 170 (Fed. Cir. 2000) (table); *Wetsel-Oviatt Lumber Co., Inc. v. United States*, 40 Fed. Cl. 557 (1998). The Court of Appeals has declined as of yet to decide the matter. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.6 (Fed. Cir. 2001).

At issue is section 12 of ADRA[5] which states in its entirety:

> SEC. 12. JURISDICTION OF THE UNITED STATES COURT OF FEDERAL CLAIMS AND THE DISTRICT COURTS OF THE UNITED STATES: BID PROTESTS.
>
> (a) Bid Protests.--Section 1491 of title 28, United States Code, is amended--

[5] The other 11 sections of ADRA deal with the reauthorization of alternative disputes methods in the federal government.

(1) by redesignating subsection (b) as subsection (c);
(2) in subsection (a) by striking out paragraph (3); and
(3) by inserting after subsection (a), the following new subsection:

"(b)(1) Both the Unite[d] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

"(2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

`"(3) In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

"(4) In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.".

(b) Effective Date.--This section and the amendments made by this section shall take effect on December 31, 1996 and shall apply to all actions filed on or after that date.

(c) Study.--No earlier than 2 years after the effective date of this section, the United States General Accounting Office shall undertake a study regarding the concurrent jurisdiction of the district courts of the United States and the Court of Federal Claims over bid protests to determine whether concurrent jurisdiction is necessary. Such a study shall be completed no later than December 31, 1999, and shall specifically consider the effect of any proposed change on the ability of small businesses to challenge violations of Federal procurement law.

(d) Sunset.--The jurisdiction of the district courts of the United States over the actions described in section 1491(b)(1) of title 28, United States Code (as amended by subsection (a) of this section) shall terminate on January 1, 2001 unless extended by Congress. The savings provisions in subsection (e) shall apply if the bid protest jurisdiction of the district courts of the United States terminates under this subsection.

(e) Savings Provisions.--

(1) Orders.--A termination under subsection (d) shall not terminate the effectiveness of orders that have been issued by a court in connection with an action within the jurisdiction of that court on or before December 31, 2000. Such orders shall continue in effect according to their terms until modified,

> terminated, superseded, set aside, or revoked by a court of competent jurisdiction or by operation of law.
>
> (2) Proceedings and applications.--(A) a termination under subsection (d) shall not affect the jurisdiction of a court of the United States to continue with any proceeding that is pending before the court on December 31, 2000.
>
> (B) Orders may be issued in any such proceeding, appeals may be taken therefrom, and payments may be made pursuant to such orders, as if such termination had not occurred. An order issued in any such proceeding shall continue in effect until modified, terminated, superseded, set aside, or revoked by a court of competent jurisdiction or by operation of law.
>
> (C) Nothing in this paragraph prohibits the discontinuance or modification of any such proceeding under the same terms and conditions and to the same extent that proceeding could have been discontinued or modified absent such termination.
>
> (f) Nonexclusivity of GAO Remedies.--In the event that the bid protest jurisdiction of the district courts of the United States is terminated pursuant to subsection (d), then section 3556 of title 31, United States Code, shall be amended by striking "a court of the United States or" in the first sentence.

Because the plain language of the ADRA at issue does not address the government's position that Section 12 somehow eliminated the implied-in-fact contract the government enters into when issuing solicitations, the Court is free to examine the legislative history to Section 12. *United States v. The Donruss Co.*, 393 U.S. 297, 302 (1969) (relying on legislative history to interpret the accumulated earnings tax because "the language of the statute [did] not provide an answer to the question" at issue). That legislative history clearly and unambiguously supports the position that Section 12 was enacted in order to eliminate bid protest jurisdiction of the federal district courts after a period of time, but in no way supports the proposition that the 50-year old doctrine of an implied-in-fact contract for good faith and fair dealing created when the government

entered the commercial marketplace and solicited bids was being eliminated by Congress.[6]

A search of the legislative history reveals that it was the Senate that first passed Section 12 as part of its consideration of the Federal Acquisition Streamlining Act of 1994. 142 Cong. Rec. S6156, 1996 WL 315422 (June 12, 1996). However, the House of Representatives rejected the change and the provision was removed. *Id.*

When it came time to consider the reauthorization of ADRA, Senator Cohen[7] proposed a floor amendment during consideration of ADRA that included Section 12. In his statement, Senator Cohen makes clear that the purpose of Section 12 was to eliminate U.S. District Court bid protest jurisdiction that had been created by the D.C. Circuit in *Scanwell Labs., Inc.* v. *Shaffer*, 424 F.2d 859 (D.C. Cir. 1969). There was no mention or discussion by Senator Cohen or others concerning the elimination jurisdiction over implied-in-fact contracts. Senator Cohen stated:

> There are two amendments to S. 1224 before the Senate for consideration. The first amendment is designed to increase the efficiency of our procurement system by consolidating jurisdiction over bid protest claims in the Court of Federal Claims. The amendment would reverse the decision of the D.C. Circuit in Scanwell Lab., Inc. versus Shaffer (1969), that permitted bid protests to be filed in any district court across the country. Providing district courts with jurisdiction to hear bid protest claims has led to forum shopping and the fragmentation of Government contract law. Consolidation of jurisdiction in the Court of Federal Claims is necessary to develop a uniform national law on bid protest issues and end the wasteful practice of shopping for the most hospitable forum. Congress established the Claims Court--now the Court of Federal Claims--for the specific purpose of

[6] To the extent that defendant relies on the concept that when Congress amends a statute, the amendment is presumed to have a purpose, the purpose, as stated in the legislative history is clear—to eliminate district court jurisdiction over bid protests.

[7] Senator Cohen was, of course, one of the Senate experts in federal procurement law, having been a co-author of the Competition in Contracting Act of 1984.

> improving the administration of the law in the areas of patents, trademarks, Government contracts, Government employment, and international trade. Scanwell jurisdiction frustrates this purpose and deprives litigants of the substantial experience and expertise the Court of Federal Claims has developed in the Government contracting area.
>
> The Information Technology and Management Reform Act of 1996, which I authored, eliminated the authority of the General Services Board of Contract Appeals to entertain bid protests on information technology contracts and left the General Accounting Office as the single extra-agency administrative forum for such actions. My amendment to S. 1224 follows this path of reform by creating a single forum for all bid protest litigation, which will lead to the development of more uniform, and thus more predictable, law.
>
> Identical legislation passed the Senate as part of the Federal Acquisition Streamlining Act, but was rejected in conference. The Department of Justice and Office of Management and Budget strongly support the addition of this legislation to the ADR Act.

142 Cong. Rec. at S6156. In support of his statement and position, Mr. Cohen had inserted into the *Congressional Record* a letter from the Department of Justice that confirmed that what was being eliminated by Congress was the protest jurisdiction of the U.S. district courts as created by the D.C. Court of Appeals for in *Scanwell Labs., Inc.*, 424 F.2d at 869. That letter states:

> Office of Legislative Affairs,
> *Washington, DC, April 12, 1996.*
>
> Hon. William S. Cohen,
>
> *Chairman, Subcommittee on Oversight of Government Management and the District of Columbia, Committee on Governmental Affairs, U.S. Senate, Washington, DC.*
>
> Dear Mr. Chairman**:** The Administration supports your efforts to enact legislation that would make one small but vital improvement to the handling of bid protests arising from the award of Federal contracts--the elimination of district court jurisdiction over bid protests (the so-called Scanwell cases).
>
> In disputes between an agency and a contractor after the award of a contract, Congress has previously recognized the need for a uniform national body of law to guide both Federal procurement officials and Federal contractors. The same

need for nationwide uniformity exists for bid protests. The current forum shopping between the Federal district courts and the Court of Federal Claims only encourages needless litigation in a search for the most hospitable forum, and results in disparate bodies of law between the circuits. There is simply no need to have multiple judicial bodies to review bid protests of federal contacts.

In the past, Congress has recognized the need for nationwide uniformity in several areas of the law, and established the Claims Court (now the Court of Federal Claims) and the Court of Appeals for the Federal Circuit to achieve that result. Federal Courts Improvement Act of 1982 (FCIA) Pub. L. No. 97-164. The purpose of the FCIA was to improve `the administration of the law in the areas of patents, government contracts, merit system protection, trademarks and international trade.' H. Rep. No. 97-312, 97th Cong., 1st Sess. 17 (1981). As a result of the enactment of the FCIA, the Court of Federal Claims was made the sole judicial forum for resolution of contract disputes between the contractor and the agency. The very same need exists for nationwide uniformity in the handling of bid protests.

By eliminating the authority of the General Services Board of Contract Appeal to entertain bid protests of the award of information technology contracts, the recently-enacted defense authorization bill for fiscal year 1996 (Pub. L. No. 104-106) took a significant step forward in the handling of bid protests by leaving the General Accounting Office as the sole remaining extra-agency administrative forum. The process of procurement reform should continue by eliminating Scanwell jurisdiction, and by creating a single judicial forum to govern all bid protest litigation, both prior to and after award. While there is good reason to apply local state law, as district courts are required to do when they adjudicate torts under the Federal Tort Claims Act, it is simply inappropriate to have different interpretations of Federal contracts applied, depending upon where the contractor resides or where the contract will be performed. This results in inconsistent application of legal principles and an unwieldy body of procurement law.

Our concerns about varying results in the district courts is not hypothetical. For example, the district court in *Advanced Seal Tech., Inc.* v. *Perry,* 873 F. Supp. 1144 (N.D. Ill. 1995), disagreed with the district court's holding in *Abel Converting, Inc.* v. *United States,* 679 F. Supp. 1133 (D.D.C. 1988), regarding the burden of proof borne by the protestor to establish grounds for injunctive relief. Similarly, the district court in *Washington Mechanical Contractors, Inc.* v. *United States Dept. of the Navy,* 612 F. Supp. 1243 (N.D. Cal. 1984), disagreed with the district court's decision in *Robert E. Dereckto of Rhode Island, Inc.* v. *Goldschmidt,* 506 F. Supp. 1059 (D. R.I. 1980), regarding the quantum of proof necessary to invalidate an award of a contract. In addition, the district court in *Metric Systems Corp.* v. *United States Dept. of the Air Force,* 673 F. Supp 439 (N.D. Fla. 1987), disagreed with the holding in *Acme of Precision Surgical Co., Inc.* v. *Weinberger,* 580 F. Supp. 490 (E.D. Pa. 1984), that Federal district courts

have both pre- and post-award bid protest jurisdiction. These cases show that, since Federal district court judges rarely have the opportunity to review bid protests, as might be suspected, the results vary from court-to-court.

Legislation should seek to accomplish three important goals. First, it should achieve a uniform and consistent body of precedent governing bid protests, by providing interested parties with a choice of only one administrative and one judicial forum for the resolution of bid protests. Second, it should discourage forum shopping between the remaining tribunal and court by imposing a similar, if not identical, standard and scope of review in both fora. Finally, it should impose a standard and scope of review which both recognizes the deference to the contracting agency in conducting procurements and also limits expensive, time-consuming and resource-intensive discovery.

As Mr. Steven Kelman, Administrator for Federal Procurement Policy, testified before your subcommittee last July:

`With its nationwide jurisdiction and contract expertise, the Court of Federal Claims could effectively and efficiently serve as a unified judicial forum operating in the national interest. This would avoid the unfairness of forum shopping. At the same time, it would not prevent small businesses from having their day in court inasmuch as the Court of Federal Claims is authorized to hold hearings throughout the country to minimize inconvenience and expense to litigants.'

In summary, the problems associated with district court bid protest activity can be effectively avoided by vesting judicial bid protests authority, both pre- and post-award, exclusively in the Court of Federal Claims and imposing a deferential standard of review and limited scope of review similar to that used by the General Accounting Office. With national jurisdiction, this court would effectively serve as a unified judicial forum with contract expertise, eliminating forum shopping and promoting the application of consistent legal principles.

We urge Congress to take immediate action to eliminate Scanwell jurisdiction in the district courts. We would be happy to work with you to ensure enactment of legislation that would meet this important objective. The Office of Management and Budget has advised that there is no objection from the standpoint of the Administration's program to the presentation of this report.

Sincerely,

Andrew Fois,
*Assistant Attorney General.*

142 Cong. Rec. at S6156-57 (footnote omitted).

Of particular note, the *Scanwell* case at issue did not cite to or even mention as a basis for district court jurisdiction over bid protests the implied-in-fact contract of good faith and fair dealing.[8]

A similar statement is found in the ADRA Conference Report.

> Section 12--House recedes to Senate amendment with modifications. This section consolidates federal court jurisdiction for procurement protest cases in the Court of Federal Claims. Previously, in addition to the jurisdiction exercised by the Court of Federal Claims, certain procurement protest cases were subject to review in the federal district courts. The grant of exclusive federal court jurisdiction to the Court of Federal Claims does not affect in any way the authority of the Comptroller General to review procurement protests pursuant to Chapter 35 of Title 31, U.S. Code.
>
> This section also applies the Administrative Procedure Act standard of review previously applied by the district courts (5 U.S.C. sec. 706) to all procurement protest cases in the Court of Federal Claims. It is the intention of the Managers to give the Court of Federal Claims exclusive jurisdiction over the full range of procurement protest cases previously subject to review in the federal district courts and the Court of Federal Claims. This section is not intended to affect the jurisdiction or standards applied by the Court of Federal Claims in any other area of the law.

H.R. Rep. No. 104-841, 104th Cong., 2d Sess. 9-10 (1996).

As a result, there is no evidence either in the plain language of Section 12 or in the direct legislative history of Section 12 that Congress actually eliminated or intended to eliminate the implied-in-fact contract of good faith and fair dealing as a basis of jurisdiction in the Court of Federal Claims that had been the rule of law for 40 years by 1996. Indeed, the basis for jurisdiction of this Court over implied-in-fact contracts was left intact by Congress. *See* 28 U.S.C. § 1491(a)(1). As a result, this Court has

---

8 *Scanwell* found that "a contractor making a prima facie showing alleging arbitrary or capricious action, or an abuse of discretion, by an agency or contracting officer in making the award of a contract, has standing to sue in district court under the Administrative Procedure Act." Andrew Fois, Letter to Senator William Cohen, n.1 (April 12, 1996) *reprinted at* 142 Cong. Rec. at S6155-56.

jurisdiction over Plaintiff's claim of the breach by the government of its implied-in-fact contract with the government.

## VII. The Government Violated The Terms Of The Implied-In-Fact Contract Of Fair Dealing.

As articulated by *Keco* supra, and as described in detail above, DOE simply lacked a rational basis for its decision to cancel the small business set-aside solicitation while continuing to purchase the required services, in an amount now exceeding $90 million, from a large business concern. The lack of a rational basis for that decision resulted in a breach of the implied-in-fact contract. That breach resulted in millions of dollars of loss to FRC calculated by adding the expenditures of FRC to seek an award – a loss that was, at least recognized in principle by DOE itself. *See* AR 15.

## CONCLUSION

Based on the foregoing, we respectfully request that the Court deny defendant's motion to dismiss and enter judgment in favor of plaintiff pursuant to Rule 52.1.

Respectfully submitted,

s/ William A. Shook
William A. Shook
Kirkpatrick & Lockhart
Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, DC 20006
Tel: (202) 661-6256
Fax: (202) 778-9100

Dated: June 18, 2008