# In the United States Court of Federal Claims

### No. 07-659C
### (Filed: March 2, 2009*)
### *OPINION ORIGINALLY FILED UNDER SEAL ON FEBRUARY 10, 2009

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * | * |
| | * |
| **FFTF RESTORATION** | * |
| **COMPANY, LLC.,** | * Cancellation of Negotiated Procurement; |
| | * Breach of Implied Contract of |
| **Plaintiff,** | * Fair Dealing; 28 U.S.C. § 1491(b); |
| | * Reviewability of Alleged Violations |
| **v.** | * of FAR 1.102(b)(3), FAR 1.102-2(c), and |
| | * FAR 19.502-2(b). |
| **THE UNITED STATES,** | * |
| | * |
| **Defendant.** | * |
| | * |
| * * * * * * * * * * * * * * * * * * | |

*William A. Shook,* Washington, DC, for plaintiff.

*Stephen C. Tosini,* U.S. Department of Justice, Washington, DC, with whom were *George G. Katsas,* Assistant Attorney General, and *Jeanne E. Davidson,* Director*,* for defendant. *H. Jack Shearer,* U.S. Department of Energy, Washington, DC, of counsel.


**O P I N I O N**


**FIRESTONE**, *Judge.*

Pending before the court are the motion of the United States ("government" or "defendant") to dismiss the complaint of the plaintiff, FFTF Restoration Company, LLC ("FRC" or "plaintiff"), for lack of jurisdiction, pursuant to Rule 12(b)(1) of the Rules of

the United States Court of Federal Claims ("RCFC"), or, in the alternative, for judgment upon the administrative record, pursuant to RCFC 52.1, and the plaintiff's cross-motion for judgment upon the administrative record.  In its amended complaint and its cross-motion for judgment on the administrative record, the plaintiff asserts that the Department of Energy ("DOE") violated its duties under the Federal Acquisition Regulations ("FAR") to conduct business with integrity, fairness, and openness and to set aside procurements for exclusive participation of small business concerns and breached its "implied-in-fact contract" to consider federal procurement proposals fairly and honestly when it cancelled a solicitation for deactivation and decommissioning of the Fast Flux Test Facility ("FFTF") reactor at the Hanford Nuclear Reservation ("Hanford" or "Hanford Site") in Richland, Washington.  The government has moved to dismiss the suit on the grounds that the plaintiff has not identified any violation of a mandatory, enforceable regulatory requirement and that the court lacks jurisdiction over implied-in-fact contract claims in the bid protest context.  In the alternative, the government argues that, even if the court finds that it has jurisdiction over the plaintiff's claims, the administrative record demonstrates that DOE's decision to cancel the solicitation was rational and made in good faith, thereby warranting judgment in the government's favor.

For the reasons set forth below, the government's motion to dismiss is **DENIED**, but the government's motion for judgment on the administrative record is **GRANTED**.  In addition, the plaintiff's motion for judgment on the administrative record is **DENIED**.

# BACKGROUND

The following background facts are taken from the amended complaint, the administrative record, and the parties' cross-motions for judgment on that record. The facts below are undisputed unless otherwise noted.

FFTF is a 400-megawatt test nuclear reactor located on the Hanford Site near Richland, Washington. Administrative Record ("AR") 2. In December 1993, DOE decided to shut down the reactor. Id. By May 1995, a National Environmental Policy Act ("NEPA") Environmental Assessment and Finding of No Significant Impact were completed for permanent shutdown and deactivation of FFTF. Id. In January 1997, DOE limited deactivation work at FFTF to those activities that would not prohibit the facility from being returned to service. Id. However, in January 2001, a Nuclear Infrastructure Programmatic Environmental Impact Statement ("EIS") and Record of Decision ("ROD") were issued, reaffirming the earlier permanent shutdown and deactivation decision. Id. In December 2001, DOE announced that it would proceed with the permanent deactivation of FFTF. Id. That same month, the deactivation work was begun by Fluor Daniel Hanford, Inc. ("Fluor"), a large business which had been awarded an environmental remediation contract in 1996, the scope of which included deactivation of the FFTF site. AR 3; Def.'s Mot. at 2. Fluor performed "approximately $3.8 million of work per month." AR 3.

In 2003, a strategy was developed to implement the FFTF closure project, including both the ongoing deactivation and any decommissioning of the facility, through a small

business set-aside acquisition.[1]  Id.  The solicitation would compete the entire scope of

work for the FFTF Closure Project, but the start of decommissioning work was

conditioned on the issuance of the FFTF Closure Project EIS and ROD.  Id.  In December

2003, DOE issued a Request for Proposals ("RFP") (Solicitation Number DE-RP06-04RL

14600) as a small business set-aside, to complete deactivation and decommissioning

(entombment) of the FFTF.  Id.  The RFP informed potential offerors that if an end-state

other than entombment were chosen, an amendment would be negotiated after award.  Id.

The government's independent cost estimate was approximately $350 million.  Id.

    Five bidders, including the plaintiff, submitted proposals in February 2004.  Id.;

Am. Compl. ¶ 11.  Following evaluation of the offers, the contracting officer ("CO")

established a competitive range of three offerors – the plaintiff, EPW Closure Services

("EPW"), and SEC Closure Alliance ("SCA").  AR 3.  DOE awarded the contract in the

amount of $235 million to SCA in September 2004.  Id.  The plaintiff filed a protest of

that award with the Government Accountability Office ("GAO"), and GAO sustained the

protest in January 2005, recommending that DOE amend the solicitation and obtain

revised proposals.[2]  Id.

    An amended RFP was issued on April 29, 2005 to the three offerors in the

---

[1]According to the plaintiff, DOE issued an Expression of Interest Notice regarding the
procurement on April 18, 2003.  Am. Compl. ¶ 6.

[2]EPW also filed a protest of the award with GAO, but GAO denied EPW's protest in
January 2005.  AR 3.

competitive range.  Id.; AR Ex. B.  The amended RFP divided the scope of work into two

separate contract line item numbers ("CLINs") – CLIN 1: deactivation; and CLIN 2:

decommissioning, demolition, and environmental restoration.  AR 3.  Although DOE

intended to issue CLIN 1 immediately upon award, the amended RFP stated that DOE

would evaluate the feasibility of CLIN 2 upon receipt of the FFTF Decommissioning EIS

and ROD ("FFTF EIS").  Id.  The amended RFP indicated that DOE would decide

whether to execute CLIN 2 no later than December 31, 2006.  Id.  The offerors submitted

revised proposals in June 2005, and the Source Evaluation Board ("SEB") determined that

each proposal had material problems that precluded award without discussions.  AR 4.  In

August 2005, DOE furnished discussion questions to each offeror, and responses were

received in September and October 2005.  Id.  In November 2005, after evaluating the

responses and proposal revisions, the SEB prepared a draft final report.[3]  Id.  According to

a December 16, 2005 memorandum from Source Selection Official ("SSO") Mark W. Frei

("Mr. Frei") to DOE Assistant Secretary for Environmental Management ("EM") James A.

Rispoli ("SSO memo"), "the CO expected to call for final revised proposals in early

---

[3]The evaluated (adjusted) prices in the draft final report for the three offerors were as
follows:  EPW at $[price redacted]; SCA at $[price redacted]; FRC at $[price redacted].  AR Ex.
D at ES-2.  The plaintiff argues that each of these offers were well under the government's $350
million cost estimate, but the government counters that that estimate was made before the
solicitation was amended and split into two separate CLINs.  The government also argues that
DOE's FFTF Decision Table reflected that the cost of finishing CLIN 1 and then going to
surveillance and maintenance would be the same for either the incumbent contractor or the
winning small business: $46 million per year from 2008-2010.  See AR 12.

December [2005] and award the contract before the end of [2005]."[4]  AR 4.

## I.     Delays Due to EIS Integration

However, in the latter part of October 2005, DOE "procurement officials first

learned that the FFTF EIS likely would be integrated with a more comprehensive EIS for

the cumulative impacts of groundwater and other environmental conditions at Hanford."

AR 4.  Specifically, according to the SSO memo, "[e]arly indications [were] that the FFTF

EIS [might] be pulled into the expanded Tank Closure EIS,"[5] which was part of EM's

consolidation of "the Hanford groundwater cumulative impact analyses and modeling

efforts into a single Hanford groundwater analysis," and which was estimated to be

completed in "the 2008 timeframe."  AR 5.  According to the SSO memo, "[t]hat

integration would delay a ROD on FFTF decommissioning until at least the latter part of

2007, and perhaps longer," and "[t]herefore, DOE would not be able to fulfill its

commitment to decide whether to execute CLIN 2 by December 2006."  AR 4.  The SSO

memo found that "[e]ven if a separate EIS for FFTF were allowed, which appears

unlikely, the December 2006 date specified in the RFP cannot be met."[6]  AR 5.

_____

[4]The plaintiff asserts that, "[o]n November 14, 2005, DOE notified the Plaintiff and other offerors that additional Final Proposal Revisions would be requested around December 1, 2005, and due on December 9, 2005."  Am. Compl. ¶ 27.

[5]The formal title of the Tank Closure EIS was the "EIS for Retrieval, Treatment, and Disposal of Tank Waste and Closure of Single Shell Tanks at the Hanford Site."  AR 5 n.1.

[6]DOE noted that the linked cumulative impacts analyses in the FFTF EIS and the "site-wide" EIS made it impossible to meet the December 2006 decision deadline, whether the FFTF EIS was done separately or integrated into the "site-wide" EIS.  AR 13.

The SSO memo explained that the delay in the decision on CLIN 2 and the likely integration of the FFTF EIS into a larger EIS would affect the timetable and pricing of the work solicited in the amended solicitation – and, consequently, DOE's evaluation of the proposals.  The SSO memo noted that, when DOE issued the amended RFP, "DOE fully expected to issue CLIN 2 and, accordingly, the costs of CLIN 2 have been evaluated as part of total proposed costs."  AR 3.  More specifically, the SSO memo noted:

> The RFP requires receipt of a Decommissioning EIS and ROD before exercise of CLIN 2, and commits DOE to a decision on execution not later than December 31, 2006.  Offerors have developed solutions and priced their propos[als] based on this commitment.  All offerors' proposals appear to anticipate the commencement of some decommissioning work (CLIN 2) before deactivation (CLIN 1) would be complete.  Depending on the offeror, the cost of CLIN 2 ranges between approximately 30% to 45% of the total proposed contract price.  It is now clear that DOE will not be able to decide whether to execute CLIN 2 by the date in the RFP. . . . [Pulling the] FFTF EIS . . . into the expanded Tank Closure EIS . . . would require that demobilization [(decommissioning)] occur after the deactivation work scope is complete, awaiting a final end-state decision sometime in 2008. . . . Consequently, the Government would need to amend the solicitation and allow offerors to revise their proposals, then reevaluate the revised proposals, and possibly conduct additional negotiations.  Consequently, if the procurement proceeds, award could not occur before spring of 2006.

AR 5 (emphasis added).[7]

_____

[7]The SSO memo also referred to the delay attributable to the plaintiff's successful protest of the original solicitation.  AR 1 ("[T]he acquisition has encountered several delays, including a successful protest of the initial award.").  The parties dispute the significance of that delay.  The plaintiff contends that DOE was to blame for the delay because it opted to "litigate[] the protest to a final decision" instead of taking corrective action.  Pl.'s Cross-Mot. at 4.  The government counters that if the plaintiff had not filed the protest, the project would have gone forward with SCA as the awardee.  The plaintiff replies that it should not be penalized for bringing the protest, given that the agency conducted itself illegally in the original solicitation, as evidenced by the success of the protest before GAO.

**II.     Reduction of Scope of Work**

The SSO memo further stated that the incumbent contractor "has been working on the deactivation [(CLIN 1)] of the FFTF throughout this procurement," and that "[c]onsequently, the monetary value of this award diminishes each day that it is not awarded."  AR 2.  Accordingly, the SSO memo found, with the delays caused by the EIS process, described above, "the residual work scope (CLIN 1) and period of performance is likely to be so small as not to be cost effective, either for the awardee or the Government."  Id.  Specifically, the SSO memo explained:

> The original acquisition strategy decision contemplated deactivation work scope to include fuel cleaning and fuel offload as well as the draining of sodium from a number of FFTF's coolant and storage systems and systems shutdown. Much of this work has been completed or will soon be completed.  Only a limited amount of fuel remains to be offloaded, and only one major sodium tank remains to be drained.  It is anticipated that the existing incumbent contractor could complete these activities within a year . . . .

AR 5.  The SSO memo concluded that,

> [d]ue to a greatly reduced scope from the existing RFP statement of work, and unavoidable delays in reaching a decision on CLIN 2 from the date stated in [the] current RFP, DOE cannot award the contract without substantial revisions to the RFP, which themselves may be so material as to require canceling the solicitation.  The modification of the RFP to redefine the scope and establish a realistic timeframe for CLIN 2 would entail significant delays in award, which render the residual work scope and period of performance to be so small as to be not cost effective for award.

AR 6 (emphasis added).

---

The court finds that, because the delay arising out of the prior successful protest was known to both parties at the time the amended solicitation was issued, and because DOE's explanation of its decision to cancel did not turn on that delay, the court need not consider the significance of that delay in reviewing the cancellation decision.

III.   **Budget Reduction and Higher Priority Projects**

The amended RFP projected that DOE would provide $44 million annually to fund

the project through contract completion.  AR 4.  However, in November 2005, DOE

procurement officials learned that the Office of Management and Budget ("OMB")

passback level for Environmental Management ("EM") funding in fiscal year ("FY") 2007

had been reduced sixteen percent from the FY 2006 appropriations level.  Id.  Meanwhile,

costs had "escalated dramatically for more critical EM projects at Hanford, such as K

Basin's sludge, Waste Treatment Plant, and plutonium secure storage," AR 4, and

"[f]ederal, state and local stakeholders [had] urged DOE to devote the limited funds

available for environmental work at Hanford to projects which [were] seen to pose higher

environmental risks than FFTF."[8]  AR 1.  According to the SSO memo, those higher

---

[8]Pursuant to the court's Order of April 17, 2008, Docket No. 25, the administrative record has been supplemented to include a Special Report, dated March 29, 2005, from DOE's Inspector General to the Secretary of Energy, which states that

> [t]he decommissioning of the FFTF may not represent the highest risk and environmental priority at Hanford.  In January 2005, the U.S. Environmental Protection Agency (EPA) and the Washington State Department of Ecology (Ecology) requested that [DOE] consider deferring portions of the work to decommission the FFTF because of higher priority cleanup projects at Hanford. . . . EPA and Ecology have asserted that the decommissioning is not one of the greatest environmental risks at Hanford.  These organizations have recommended that tight cleanup budgets be shifted to higher priority cleanup projects.

AR Ex. A.

In addition, pursuant to the April 17, 2008 Order, the record contains a memo dated May 2, 2005 (after the amended RFP was issued on April 29, 2005) from the Principal Deputy Assistant Secretary for EM, Paul M. Golan ("Mr. Golan"), to DOE's Inspector General, responding to the March 2005 Special Report.  AR Ex. B.  In that memo, Mr. Golan explained that the way the amended RFP was structured – "such that only the deactivation [Statement of

priority projects were "experiencing cost growth, such that they [would] require a higher

proportion of EM Hanford funding," meaning that "DOE [would] not have sufficient

funds to support FFTF at the level anticipated in the revised RFP issued in April" 2005.

AR 4.  The SSO memo stated that "the cost of FFTF will need to [be] either reduced or

stretched out over a longer period of time, and the scope of work both for deactivation and

decommissioning redefined accordingly."  AR 5.  Moreover, the memo noted that

"[c]ompletion of both deactivation and decommissioning work scopes at this time is very

unlikely because of budget constraints and the need to shift funds to higher priority

projects.  Therefore, only the minimum deactivation consistent with a long term, low cost

---

Work] is authorized for immediate execution with a decision point after the issuance of a [ROD]
. . . that will determine what the end state will be" – allowed DOE to "consider other factors such
as the Hanford Site budget and cleanup priorities . . . (the issue raised by the State of Washington
and the [EPA])" at the time of the "decision point," "before committing to the final
decommissioning phase of this project."  Id.  Mr. Golan went on to note that DOE had "discussed
these changes with [the] Hanford Site regulators – [EPA] and [Ecology] – and they indicated that
[DOE's] approach addresse[d] their concerns."  Id.
        SSO Mark Frei stated that these documents "were not before the decision-makers at the
time they reached their decision to cancel the Solicitation."  Frei Decl. at 1.  However, because
these DOE-issued materials were available to the DOE at the time the cancellation decision was
made, the court will consider them as part of the administrative record.  The documents are
relevant to the plaintiff's arguments regarding what the agency knew at the time it issued the
amended RFP, compared to what it knew when it later decided to cancel the solicitation.  See,
e.g., Maritel, Inc. v. Collins, 422 F.Supp.2d 188, 196 (D.D.C. 2006) ("To ensure fair review of an
agency action, . . . the court should have before it neither more nor less information than did the
agency when it made its decision. . . . [T]he record must include all documents and materials that
the agency directly or indirectly considered.  The agency may not skew the record in its favor by
excluding pertinent but unfavorable information.  Nor may the agency exclude information on
the grounds that it did not 'rely' on the excluded information in its final decision.  On the other
hand, an agency may exclude arguably relevant information that is not contained in the agency's
files but that may be available from third parties." (internal quotations and citations omitted)).

surveillance mode should be pursued."[9]  AR 6.

## IV.   Solicitation Cancelled

In the December 16, 2005 SSO memo, Mr. Frei recommended cancellation of the

solicitation, stating that "it clearly [was] no longer in DOE's best interests to proceed with

[the] procurement" and summarizing the reasons as follows:

> (1) budget constraints will significantly affect the funding available for all EM
> projects at Hanford in FY 2007 and beyond, requiring a substantial reduction
> in funding available for FFTF; (2) the RFP now is incorrect in stating that a
> decision whether to execute CLIN 2 will be made by December 2006, requiring
> further revisions to the RFP and additional delays in any award; and (3) steady
> progress by the incumbent contractor on deactivation of FFTF continues to
> diminish the scope of this procurement and the potential revenue for any
> awardee.

AR 4.  The SSO memo stated that "EM has examined a full range of options for

consideration," each of which was "analyzed using decision criteria of mission success,

funding availability, NEPA, regulator stakeholder interests, cost and schedule, acquisition

---

[9]The plaintiff submitted extra-record materials purporting to demonstrate that "DOE has, in fact, spent $90,046,000 since the cancellation on solicitation services."  Pl.'s Cross-Mot. at 5 (citing Pl.'s Cross-Mot. Attachs. 2 & 3 (DOE EM Congressional Budget Requests, FY 2007 and FY 2009, respectively)).  The government counters that these non-record attachments are outside the scope of review and should be disregarded, arguing that DOE's budget requests subsequent to the December 22, 2005 cancellation are, by definition, outside the administrative record and have no bearing on whether the cancellation is permissible.  Def.'s Reply at 3-4.

The court agrees with the government that, because these materials were not before the decision maker at the time the decision to cancel was made, the court may not properly consider them.  See, e.g., Great Lakes Dredge & Dock Co. v. United States, 60 Fed. Cl. 350, 359 (2004) ("[I]t is well settled that 'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'  Camp v. Pitts, 411 U.S. 138, 142 . . . (1973).  That record consists of the materials and files that were before the agency at the time the decision was made.  See Florida Power & Light v. Lorion, 470 U.S. 729, 743 . . . (1985); Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp., 423 U.S. 326, 331 . . . (1976)." (emphasis added)).

objectives, and small business interests."[10]  AR 6.

The SSO memo recommended that "the best path forward [was] to cancel the FFTF Project Closure solicitation, get the facility to a lower risk deactivated status, and put the facility in a long-term, low-cost [S&M] mode."  AR 6.  The memo further recommended that the "incumbent site contractor proceed with the minimum work required to bring the facility to a low risk status for a long term and low cost [S&M] mode."  AR 2.  Mr. Frei explained that the decision was not "reached casually or lightly," stating that, "[i]n making this recommendation, the SSO has considered the costs expended by the small businesses that have participated in this procurement."  Id.  Mr. Frei also noted that "[u]ntil very recently, the SSO fully expected to select one of those small businesses for award . . . ."  Id.  However, he reiterated that "it is not in the Government's best interests to continue with this solicitation."  Id.  The Assistant Secretary for EM concurred with Mr. Frei's recommendation.  AR 16.  Accordingly, on December 22, 2005, the CO cancelled the

---

[10]The administrative record contains an "FFTF Decision Table," dated November 28, 2005, indicating that four FFTF Options were considered: (1) Amend RFP – Continue CLIN 1 and CLIN 2; (2) Amend RFP – Continue CLIN 1, Cancel CLIN 2, Go to Surveillance and Maintenance ("S&M"); (3) Cancel RFP – Incumbent Contractor Completes CLIN 1 Scope, Go to S&M; and (4) Cancel RFP - Discontinue Project in FY 2007, Go to S&M.  AR 12-15. According to the decision table, the pros and cons of each option were evaluated in terms of: Mission Success, NEPA Approach, Regulator/Stakeholder Interests, Cost and Schedule, and Acquisition Objectives/Small Business Interests.  AR 12-15.

Of particular note, the Acquisition Objectives/Small Business Interests section of the FFTF Decision Table reflected the determination that continuing with the incumbent contractor would not "meet . . . major small business objective," thereby "plac[ing] greater pressure for small business opportunities in future acquisitions," and that there would be a "large financial impact on small business offerors (bid and proposal costs, lost revenue)."  AR 15.

solicitation.  AR 16, 17; see also Certification of the AR by Mark Frei.

## V.     The Present Litigation

### A.     The Plaintiff's Claims

The plaintiff filed a complaint in this court on September 10, 2007, and an amended

complaint on February 19, 2008, seeking $4,073,373 in damages, plus attorneys fees and

other appropriate relief.  The plaintiff seeks to recover the following alleged expenditures:

$216,384 in preparations before the initial RFP was issued; $2,524,398 spent preparing,

submitting, and revising its initial proposal; $719,935 spent pursuing the first, successful

bid protest (less the $224,116 in protest costs which have already been reimbursed by

DOE); and $836,772 spent preparing, submitting, and revising its proposal for the

amended solicitation.  Pl.'s Cross-Mot. at 8-9; Am. Compl. ¶¶ 6, 14, 21, 29.

The plaintiff's amended complaint lists three causes of action.  Counts I and II

allege violations of the FAR and are brought pursuant to the court's bid protest jurisdiction

over "any alleged violation of statute or regulation in connection with a procurement or a

proposed procurement" under 28 U.S.C. § 1491(b)(1) (2000).  Specifically, Count I alleges

that the government violated FAR 1.102(b)(3), 48 C.F.R. § 1.102(b)(3) (2004), and FAR

1.102-2(c), 48 C.F.R. § 1.102-2(c) (2004), which require the government to "[c]onduct

business with integrity, fairness, and openness," when DOE encouraged the plaintiff to

expend resources responding to the solicitation and the amended solicitation instead of

"disclos[ing] to Plaintiff [DOE's] real intent of cancelling the Amended Solicitation while

continuing to have the work performed by a large business contractor." Am. Compl. ¶¶ 1, 34-41. Count II alleges that, when the government cancelled the amended solicitation and allowed the large business incumbent contractor to perform the work specified therein, the government violated FAR 19.502-2(b), 48 C.F.R. § 19.502-2(b) (2004), which provides, inter alia, that "[t]he contracting officer shall set aside any acquisition over $100,000 for small business participation when there is a reasonable expectation that (1) offers will be obtained from at least two responsible small business concerns . . . ; and (2) award will be made at fair market prices."

Count III of the plaintiff's amended complaint alleges that DOE breached its implied-in-fact contract with the plaintiff to consider proposals fairly and honestly when it encouraged the plaintiff to participate in the solicitation process while at the same time making the determination to cancel the amended solicitation and have the work performed by a large business contractor.[11]

B.     **The Pending Motions**

The government moved to dismiss the complaint pursuant to RCFC 12(b)(1) for

---

[11]Though the plaintiff's papers do not expressly state a purported statutory basis for this court's jurisdiction over the implied-in-fact contract claim, the amended complaint cites to 28 U.S.C. § 1491(a)(1) (2000), which grants the Court of Federal Claims "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." (emphasis added). However, at oral argument, the plaintiff clarified its position that the implied-in-fact contract claim is incorporated into the provisions of FAR 1.102 requiring integrity, fairness, and openness in the Federal Acquisition System, Tr. of Oral Arg. 30:6-20, such that the purported jurisdictional basis for Count III, just as for Counts I and II, is 28 U.S.C. § 1491(b)(1).

lack of subject matter jurisdiction, or, in the alternative, for judgment on the administrative record pursuant to RCFC 52.1. In its motion to dismiss, the government argues that the plaintiff has not identified any enforceable regulatory requirement that would prohibit the actions taken by DOE in cancelling the amended solicitation. In addition, the government argues that this court lacks jurisdiction to consider the plaintiff's implied-in-fact contract claim because, following the enactment of the Administrative Dispute Resolution Act ("ADRA"), Pub. L. No. 104-320, § 12(a), 110 Stat. 3874 (Oct. 19, 1996), this court's jurisdiction to entertain bid protest claims lies solely under 28 U.S.C. § 1491(b), not the provision for implied contract claim jurisdiction in 28 U.S.C. § 1491(a)(1). The government further contends that, because 28 U.S.C. § 1491(b)(1) only allows for objections to (1) "a solicitation by a Federal agency for bids or proposals for a proposed contract," (2) "a proposed award," (3) "the award of a contract," or (4) "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," see 28 U.S.C. § 1491(b)(1), and the plaintiff's objection to the cancellation of the solicitation does not fall into any of those categories, the court may not consider the plaintiff's claim. In fact, the government argues that "cancellation of a negotiated procurement is an act committed to agency discretion for which there are no legal standards to apply." Def.'s Reply at 16 (emphasis added). Therefore, the government argues, this court lacks jurisdiction to review DOE's cancellation of the solicitation.

In the alternative, the government argues in its motion for judgment on the administrative record that, even if the court finds that it has jurisdiction over the plaintiff's

claims, the record demonstrates that DOE's decision to cancel the solicitation did not

violate any statute or regulation and was made in good faith, thereby warranting judgment

in the government's favor.  The government contends that the plaintiff has failed to

identify any evidence of bad faith and that the unanticipated delays in the EIS, the

consequential need to postpone a decision on the decommissioning phase of the project,

the significant reduction in DOE's budget, and the progress of the incumbent contractor in

completing the deactivation phase, as explained in the SSO memo and the FFTF Decision

Table, provided ample support for the decision to cancel the solicitation.

In response to the defendant's motion to dismiss, the plaintiff argues that the

statement that "[t]he Federal Acquisition System will . . . [c]onduct business with integrity,

fairness, and openness," FAR 1.102(b)(3) (emphasis added), is mandatory, especially

when read in conjunction with FAR 1.102-2(c), which requires, inter alia, that "[a]ll

contractors and prospective contractors shall be treated fairly and impartially," (emphasis

added),[12] and that an agency's conduct in cancelling a negotiated procurement must

comport with those FAR provisions.  In addition, the plaintiff argues that the implied-in-

fact contract to consider all proposals fairly and honestly is encompassed within the

provisions of FAR 1.102.  Tr. of Oral Arg. 30:6-20.  Therefore, the plaintiff argues, this

court has jurisdiction to consider all of the plaintiff's claims pursuant to 28 U.S.C. §

1491(b)(1), which allows review of "any alleged violation of statute or regulation in

---

[12] See Pl.'s Cross-Mot. at 12 (citing FAR 1.102-2(c)(3) and 1.102-2(c)(1)).

connection with a procurement or a proposed procurement."  The plaintiff further contends

that the government's decision to cancel the solicitation in this case may be reviewed

according to the standard set forth in 28 U.S.C. § 1491(b)(4), which incorporates the

"arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law"

standard of review from the Administrative Procedure Act ("APA"), 5 U.S.C. § 706

(2000).

In its cross-motion for judgment on the administrative record, the plaintiff contends

that the record in this case demonstrates that DOE did not treat the bidders with integrity,

fairness, and openness, because DOE did not have a rational basis for cancelling the small

business set-aside solicitation and instead authorizing the large business incumbent to

perform the work.  The plaintiff contends that each of the reasons given by DOE to justify

the cancellation was either known to DOE at the time the amended solicitation was issued

or was not supported by the evidence before DOE.

Oral argument was held on December 5, 2008.

## SCOPE AND STANDARDS OF REVIEW

### I.      Standards of Review: Motions to Dismiss

In considering a motion under RCFC 12(b)(1) to dismiss for lack of subject matter

jurisdiction, the court is generally "obligated to assume all factual allegations to be true

and to draw all reasonable inferences in plaintiff's favor."  Henke v. United States, 60 F.3d

795, 797 (Fed. Cir. 1995) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).  In

evaluating a 12(b)(1) motion, the court "may find it necessary to inquire into jurisdictional facts that are disputed." Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991). "A party seeking the exercise of jurisdiction in its favor has the burden of establishing that such jurisdiction exists," id., and that party must establish subject matter jurisdiction by a preponderance of the evidence. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

## II.     Scope of Review: Motions for Judgment on the Administrative Record

RCFC 52.1, which allows for motions for judgment on the administrative record, is "designed to provide for trial on a paper record, allowing fact-finding by the trial court." Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (describing RCFC 56.1, the predecessor to RCFC 52.1). "Summary judgment standards are not pertinent to judicial review upon an administrative record." RCFC 52.1, rules committee note (2006 Adoption) (citing Bannum, Inc., 404 F.3d at 1355-57). Thus, "[u]nlike a motion for summary judgment, a genuine dispute regarding a material fact will not preclude a judgment on the administrative record." Textron, Inc. v. United States, 74 Fed. Cl. 277, 286 (2006) (citing Bannum, Inc., 404 F.3d at 1356). Instead, in ruling on a motion under RCFC 52.1, the court will make "factual findings . . . from the record evidence as if it were conducting a trial on the record." Bannum, Inc., 404 F.3d at 1357.

## III.    Standards of Review: Bid Protest Actions

The Court of Federal Claims has jurisdiction to adjudicate bid protest claims pursuant to the Tucker Act, 28 U.S.C. § 1491(b), which provides this court with

jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement[,] . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1); see also, e.g., Impresa Construzioni Geom. Domenici Garufi v. United States, 238 F.3d 1324, 1330 (Fed. Cir. 2001).

The Tucker Act further provides that, "[i]n any action under this subsection [28 U.S.C. § 1491(b)], the courts shall review the agency's decision pursuant to the standards set forth in [the APA,] section 706 of title 5."  28 U.S.C. § 1491(b)(4).  In particular, the United States Court of Appeals for the Federal Circuit has held that "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (quoting 5 U.S.C. § 706(2)(A); citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)); see also Int'l Res. Recovery, Inc. v. United States, 60 Fed. Cl. 428, 431 (2004) ("'While a disappointed bidder does not have the right to have a federal court substitute its judgment for that of the administrative agency, the bidder does have the right to introduce appropriate evidence to allow the court to determine whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting GraphicData, LLC v. United States, 37 Fed. Cl. 771, 780 (1997))).  The Federal Circuit has further clarified that

28 U.S.C. § 1491(b)(4) "only incorporates the <u>standard of review</u> of [5 U.S.C. §]

706(2)(A)," not the provision in 5 U.S.C. § 706(2)(A) that the reviewing court "shall . . .

set aside" agency action, nor the requirement in 5 U.S.C. § 706(1) that a reviewing court

"compel agency action unlawfully withheld or unreasonably delayed," which "speaks to

the situation in which an agency has improperly failed to act" and is not "relevant to bid

protest cases." PGBA, LLC v. United States, 389 F.3d 1219, 1225-27 (Fed. Cir. 2004)

(emphasis added).

In applying the APA standard of review to bid protest actions, the Federal Circuit

has held that an agency's decision "'may be set aside if either: (1) the procurement

official's decision lacked a rational basis; or (2) the procurement procedure involved a

violation of regulation or procedure.'" CHE Consulting, Inc. v. United States, ___ F.3d

____, 2008 WL 5397566, *2 (Fed. Cir. 2008) (quoting PGBA, LLC v. United States, 389

F.3d 1219, 1225 (Fed. Cir. 2004)).  "When a challenge is brought on the first ground, the

courts have recognized that contracting officers are entitled to exercise discretion upon a

broad range of issues confronting them in the procurement process." Impresa, 238 F.3d at

1332 (internal quotation omitted).  Accordingly, a reviewing court must "determine

whether the contracting agency provided a coherent and reasonable explanation of its

exercise of discretion, . . . and the disappointed bidder bears a heavy burden of showing

that the [agency's] decision had no rational basis." Id. at 1333 (internal quotations

omitted).  To show a violation of a regulation or procedure, "a claimant must show 'a clear

and prejudicial violation of applicable statutes or regulations.'"[13]  Galen Med. Assocs. v.

United States, 369 F.3d 1324, 1331 (Fed. Cir. 2004) (quoting Banknote, 365 F.3d at 1351).

## DISCUSSION

**I.     This Court Has Jurisdiction Under 28 U.S.C. § 1491(b)(1) to Consider the Plaintiff's Challenge of DOE's Decision to Cancel the Negotiated Procurement.**

As noted above, the government argues that "cancellation of a negotiated

procurement is an act committed to agency discretion for which there are no legal

standards to apply."  Def.'s Reply at 16 (emphasis added).  The government contends that,

pursuant to 28 U.S.C. § 1491(b)(1), this court only has jurisdiction to adjudicate a claim in

the bid protest context if the claim challenges (1) "a solicitation by a Federal agency for

bids or proposals for a proposed contract," (2) "a proposed award," (3) "the award of a

contract," or (4) "any alleged violation of statute or regulation in connection with a

procurement or a proposed procurement."  See 28 U.S.C. § 1491(b)(1).  The government

further argues that, because an objection to the cancellation of a solicitation is not an

objection to (1) the solicitation, (2) a proposed award, or (3) an award, unless some

violation of a statute or regulation in connection with the cancellation can be identified,

this court lacks jurisdiction to consider the plaintiff's claims that the cancellation lacked a

---

[13]To establish prejudice, a protester "must show that there was a 'substantial chance' it would have received the contract award but for the errors" alleged.  Bannum, Inc., 404 F.3d at 1353 (citations omitted).  Normally, "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits."  Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  However, in this case, the government has not disputed whether the plaintiff was prejudiced.

rational basis.  Moreover, the government argues that, in contrast to the provisions in FAR

Part 14 governing the cancellation of "sealed bid" procurements, "[t]here is simply no

statute or regulation that governs the pre-award cancellation of a negotiated procurement,

such as that in this case."  Def.'s Reply at 9-10 (citing, e.g., FAR 14.404-1[, 48 C.F.R.

14.404-1 (2004)]).  Thus, the government's argument amounts to an assertion that

cancellation decisions in the negotiated procurement context, such as the one at issue in

this case, are immune from any sort of judicial review, including both the "rational basis"

review and review for "clear and prejudicial violation of applicable statutes or regulations"

normally available for bid protest actions.[14]  See Impresa, 238 F.3d at 1332-33.

　　　For the reasons that follow, the court rejects the government's attempt to carve out

challenges to negotiated procurement cancellations from this court's bid protest

jurisdiction.[15]  The court finds that 28 U.S.C. § 1491(b)(1) authorizes this court to review

―――――――――――――

　　　[14]At oral argument, the government stated that, in extreme situations involving, for
example, bad faith in the cancellation decision, "there will be a violation of a statute or regulation
in connection with a procurement" for the plaintiff to challenge.  Tr. of Oral Arg. 13:4 - 15:15.
See, e.g., FAR 3.104, 48 C.F.R. § 3.104 (2004) ("Procurement integrity"); see also, e.g., FAR
3.104-2(b)(1) ("The offer or acceptance of a bribe or gratuity is prohibited by 18 U.S.C. [§] 201
and 10 U.S.C. [§] 2207. . . .").

　　　[15]The court agrees with the government that FAR Part 15, governing negotiated
procurements, does not set forth standards for cancellation in as much detail as FAR Part 14,
governing sealed bidding.  See, e.g., FAR 14.404-1.  However, FAR Part 15 does, in fact,
provide some constraints, albeit very loose ones, on an agency cancelling a negotiated
procurement.  Specifically, in a negotiated procurement, the contracting agency's decision to
cancel a solicitation is governed by FAR 15.305(b), 48 C.F.R. § 15.305(b) (2005), which states
in its entirety: "The source selection authority may reject all proposals received in response to a
solicitation, if doing so is in the best interest of the government."  FAR 15.305(b); DCMS-ISA,
Inc. v. United States, 84 Fed. Cl. 501, 511 (2008).
　　　In their briefing, neither party addressed the application of FAR 15.305(b) to this case.

cancellations of negotiated procurements to ensure compliance with the requirements of

"integrity, fairness, and openness" in FAR 1.102(b)(3) and the requirement that "[a]ll

contractors and prospective contractors shall be treated fairly and impartially" in FAR

1.102-2(c)(3).

>   **A.** **The Provisions of FAR 1.102 Cited by the Plaintiff in Challenging the Cancellation Contain Mandatory Duties "in Connection with a Procurement," Not Simply Internal Operating Guidelines, and Alleged Violations Thereof Are Reviewable Under 28 U.S.C. § 1491(b)(1).**

First, the court finds that the violations of FAR 1.102 alleged by the plaintiff in the

context of the cancellation of a negotiated procurement constitute "alleged violation[s] of

statute or regulation in connection with a procurement," over which this court has

jurisdiction pursuant to 28 U.S.C. § 1491(b)(1).  As noted above, 28 U.S.C. § 1491(b)(1)

confers jurisdiction over "an action by an interested party objecting to . . . any alleged

violation of statute or regulation in connection with a procurement or a proposed

_____

However, at oral argument, the government argued that even FAR 15.305(b) does not apply to decisions to cancel "the entire solicitation" where, as here, "[t]here was no finding of any sort of fault with respect to the bids."  Tr. of Oral Arg. 6:7 - 7:15.  In the instant case, the government argued, the agency's cancellation decision was not "a decision to find all of the bids not responsive," but rather "the question was whether the government needs to go on with purchasing something that it can't afford and doesn't need."  Id.

     The court sees no basis under FAR 15.305(b) for distinguishing between (1) rejecting all proposals by cancelling the solicitation because the solicitation does not meet the government's needs, and (2) rejecting all proposals by cancelling the solicitation because the solicitation failed to garner any proposals that meet the government's needs.  See DCMS-ISA, 84 Fed. Cl. at 513-17 (finding that FAR 15.305(b) applied, but was not violated, where an agency cancelled a solicitation after determining that "the acquisition strategy had failed to result in proposals that met the government's needs for the project" (emphasis added)).  However, because the plaintiff in this case does not claim a violation of FAR 15.305(b), the court merely raises the regulation as further refutation of the government's claim that cancellation of a negotiated procurement is not subject to any legal standards or judicial scrutiny.

procurement."  In interpreting the language of 28 U.S.C. § 1491(b)(1), the Federal Circuit

has held that "[t]he operative phrase 'in connection with' is very sweeping in scope," and

"[a]s long as a statute has a connection to a procurement . . . , an alleged violation suffices

to supply jurisdiction."  Ramcor Servs. Group, Inc. v. United States, 185 F.3d 1286, 1288

(Fed. Cir. 1999).  However, the Federal Circuit has also cautioned that "'the fact that a

procurement practice is prohibited does not necessarily mean that it is therefore

actionable.'"  Am. Tel. & Tel. Co. v. United States ("AT&T"), 307 F.3d 1374, 1380 (Fed.

Cir. 2002) (quoting E. Walters & Co. v. United States, 576 F.2d 362, 367 (Ct. Cl. 1978)).

In particular, procurement provisions that are merely "cautionary and informative" and

"provide only internal government direction" are not actionable.  AT&T, 307 F.3d at

1379-80.

     In this case, the government does not dispute that FAR 1.102, invoked in the

context of the cancellation of a negotiated procurement, "has a connection to a

procurement."  See Ramcor, 185 F.3d at 1288.  Rather, the government claims that FAR

1.102 is not sufficient to supply this court with jurisdiction because its provisions are

simply procurement guidelines that impose no mandatory duty, and therefore, by

definition, cannot be "violated."  In particular, with regard to FAR 1.102(b)(3), which

provides that "[t]he Federal Acquisition System will . . . [c]onduct business with integrity,

fairness, and openness," the government claims that it is merely an aspirational provision

that imposes no clear duty.  Pointing, for example, to the heading with which FAR 1.102

begins – "Statement of guiding principles for the Federal Acquisition System" – and the

reference in FAR 1.102(a) to the "vision for the Federal Acquisition System," the

government argues that FAR 1.102 contains only guidelines and no required actions.

Of the cases cited by the government in support of its argument, only AT&T v.

United States, 307 F.3d at 1374, is relevant to determining whether this court has

jurisdiction over a challenge to particular procurement regulations.[16]  In AT&T, the

---

[16]The inapposite cases cited by the government can be briefly summarized as follows:
First, the government cites Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 63 (2004), which held that "[a] claim under [5 U.S.C.] § 706(1) [compelling agency action unlawfully withheld] can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." (emphasis in original).  The government argues that because FAR 1.102 does not specify any actions the agency was required to take, alleged violations of it are not actionable.  However, because the plaintiff in this case has not made a claim under 5 U.S.C. § 706(1) to compel agency action unlawfully withheld, the principle from Norton cited by the government has no bearing on this case.  Here, instead, the plaintiff has called upon the court to review alleged violations of FAR 1.102 in a bid protest claim under 28 U.S.C. § 1491(b)(1), triggering the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard of review, as set forth in 5 U.S.C. § 706(2)(A).  As noted above, the Federal Circuit has held that the standard in 5 U.S.C. § 706(1) is not relevant in the bid protest context.  PGBA, 389 F.3d at 1227.
On a related note, relying heavily on Heckler v. Chaney, 470 U.S. 821 (1985), the government claims that review of an alleged violation of FAR 1.102 according to the standards of 5 U.S.C. § 706 would be precluded because the APA does not apply when "agency action is committed to agency discretion by law."  Def.'s Mot. at 14-15 (quoting 5 U.S.C. § 701(a)(2) (2000)); Def.'s Reply at 10.  However, the government is introducing APA standards which have no application in the present context.  First, Heckler v. Chaney dealt with the unique area of an agency's decision whether or not to undertake enforcement actions requested by the plaintiffs.  470 U.S. at 837-38.  Moreover, as discussed in detail infra, the court finds that, unlike in Heckler v. Chaney, there are, in fact, standards to apply in reviewing violations of FAR 1.102(b)(3) and 1.102-2(c), drawn from the extensive history of reviewing agency decisions for good faith and fair dealing in the bid protest context.  In addition, the court notes that this case does not involve reviewability under 5 U.S.C. § 701(a)(2) of the APA, as Heckler v. Chaney did, 470 U.S. at 837-38.  As noted supra, the Federal Circuit has held that 28 U.S.C. § 1491(b)(4) "involves a much narrower incorporation [of the APA], specifically section 706(2)(A) of title 5 in connection with bid protest actions," not "a broad incorporation of chapter 7 of title 5."  PGBA, 389 F.3d at 1227.
The government also cites Carolina Tobacco Co. v. United States, 402 F.3d 1345 (Fed.

plaintiff alleged that a contracting officer's selection of contract type had violated a variety

of procurement regulations and directives.  307 F.3d at 1379.  The Federal Circuit first

found that "the regulations and directives [cited by the plaintiff] grant the contracting

officer the discretion to select the type of contract" before soliciting bids.  Id. at 1379-80

("'Selection of the appropriate contract type is, in the final analysis, the responsibility of

the contracting officer,' . . . subject to his good discretion." (quoting 48 C.F.R. §

216.104(1) (1987))).  The Federal Circuit in AT&T then held that, "[e]ven if the

contracting officer abused his discretion by negotiating the . . . contract on a fixed-price

basis . . .[,] that finding still would not provide [the plaintiff] a remedy," because "[t]hese

cautionary and informative regulations and directives provide only internal governmental

direction" and therefore were not actionable.  AT&T, 307 F.3d at 1379-80 (emphasis

added).

    By contrast to the regulations at issue in AT&T, however, the FAR provisions at

issue here are not simply internal operating guidelines, but instead involve the

government's obligations with regard to its dealings with outside parties.  Cf. AT&T, 307

F.3d at 1380.  FAR 1.102(b)(3) states that "[t]he Federal Acquisition System will . . .

---

Cir. 2005), for the proposition that the inclusion of "guidelines" in a regulation do not impose
any "explicit requirement" upon the Government agency to act in a certain manner.  However,
because Carolina Tobacco involved an importer challenging the United States Customs Service's
increase in the amount of its import bond, not a bid protest challenging a procurement or a
proposed procurement, the case is not instructive in determining whether the alleged FAR
violations in this case constitute "any alleged violation of statute or regulation in connection with
a procurement or a proposed procurement" over which this court would have jurisdiction under
28 U.S.C. § 1491(b)(1).

[c]onduct business with integrity, fairness, and openness." The provision, while broad, places limits on the government's exercise of discretion vis-à-vis its interactions with entities outside the government. Specifically, FAR 1.102-2(c) contains provisions setting forth "<u>Performance standards</u>" for "[c]onduct[ing] business with integrity, fairness, and openness." (emphasis added). For example, FAR 1.102-2(c)(1) states that "[f]airness and openness <u>require</u> open communication among team members, internal and <u>external</u> <u>customers, and the public</u>." (emphasis added). In addition, FAR 1.102-2(c)(3) requires that "[a]<u>ll contractors and prospective contractors shall</u> be treated fairly and impartially but need not be treated the same." (emphasis added). Thus, unlike the provisions at issue in <u>AT&T</u>, which provided internal guidelines for the agency's actions prior to soliciting bids from the public, 307 F.3d at 1379-80, the provisions of FAR 1.102(b)(3) and 1.102-2(c) cited by the plaintiff in this case are aimed at ensuring that the government's actions respecting bidders – i.e., persons outside the government – are conducted fairly and transparently. In further contrast to the provisions at issue in <u>AT&T</u>, the provisions of FAR 1.102(b)(3) and 1.102-2(c) are phrased in mandatory terms, giving rise to mandatory duties that constrain the government's discretion in dealing with bidders. <u>See, e.g.</u>, FAR 1.102(b)(3) ("The Federal Acquisition System <u>will</u> . . . conduct business with integrity fairness and openness." (emphasis added)); FAR 1.102-2(c)(3) ("All contractors and prospective contractors <u>shall</u> be treated fairly and impartially." (emphasis added)); <u>see also</u> <u>Dynacs Eng'g Co., Inc. v. United States</u>, 48 Fed. Cl. 124, 131 (2000) ("The FAR <u>requires</u>

-27-

'integrity, fairness and openness' in procurements conducted under the Federal

Acquisition System.  FAR § 1.102(b)(3)." (emphasis added)).[17]

   The government in this case has not offered any justification for carving the

cancellation of a negotiated procurement out of this court's unambiguous jurisdiction over

bid protest actions.  While the agency has significant discretion and is constrained by few

specific regulatory requirements in such decisions, as discussed below, the court does not

see fit to exempt the decision to cancel a negotiated procurement from judicial scrutiny

altogether.  Thus, where, as here, the plaintiff claims that an agency, in deciding to cancel

a negotiated procurement, has failed to act with integrity, fairness, and openness or to treat

bidders fairly under FAR 1.102(b)(3) and 1.102-2(c), this court has jurisdiction over the

claim as an actionable "alleged violation of statute or regulation in connection with a

procurement" pursuant to 28 U.S.C. § 1491(b)(1).[18]

_____

   [17]As the plaintiff correctly notes, the implication of the government's argument is that, notwithstanding FAR 1.102, federal acquisition officials have the discretion to choose whether or not to act with integrity, fairness, and openness or treat bidders fairly and impartially – an absurd position in light of the plainly mandatory language of the provisions of FAR 1.102(b)(3) and 1.102-2(c).  See also FAR 3.101-1, 48 C.F.R. § 3.101-1 (2004) ("Standards of conduct. Government business shall be conducted in a manner above reproach and . . . with complete impartiality and with preferential treatment for none.  Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships." (emphasis added)).

   [18]The court is aware of the recent decision in Information Sciences Corp. v. United States, 85 Fed. Cl. 195, 201-02 (2008), in which the court reached a different conclusion regarding two of the provisions of FAR 1.102 – specifically FAR 1.102(b)(3) and FAR 1.102-2(c)(1). However, this case arises under a different factual scenario involving alleged regulatory violations in connection with a cancellation decision, and for that reason as well as the reasons set forth supra, the court respectfully declines to follow the holding in Information Sciences.

**B.**   **The Implied-in-Fact Contract to Consider All Proposals Fairly and Honestly in Cancelling a Negotiated Procurement is Encompassed Within the Provisions of FAR 1.102(b)(3) and 1.102-2(c)(3).**

Next, the court turns to the question of whether it has jurisdiction to consider the plaintiff's implied-in-fact contract claim.  The plaintiff claims that an implied-in-fact contract of good faith and fair dealing, under which the government was obligated to consider the plaintiff's proposal fairly and honestly, arose when FRC submitted a proposal in response to DOE's solicitation and that this implied contract was breached when DOE, without a rational basis, decided to cancel the small business set-aside solicitation while continuing to purchase the required services from a large business concern.  The government argues that the plaintiff's implied-in-fact contract theory is barred in the bid protest context because, following the passage of the ADRA, 28 U.S.C. § 1491(b)(1) is the only remaining source of the court's bid protest jurisdiction, and sovereign immunity principles dictate that, because 28 U.S.C. § 1491(b)(1) does not expressly allow for an implied contract theory in connection with the procurement process, jurisdiction over such a claim did not survive the ADRA.[19]

For the reasons set forth below, the court finds that the implied-in-fact contract to consider all proposals fairly and honestly is encompassed within the provisions of FAR 1.102(b)(3) and 1.102-2(c)(3).  Therefore, although this court's jurisdiction is no longer

---

[19]With regard to the solicitation cancellation specifically, the government argues, as discussed <u>supra</u>, that no causes of action – including a claim based on an implied contract theory – are available to the plaintiff, in light of the limited categories of bid protest actions available under 28 U.S.C. § 1491(b)(1).

predicated on such an implied-in-fact contract claim following the passage of the ADRA,

the court nonetheless has jurisdiction under 28 U.S.C. § 1491(b)(1) to consider the

plaintiff's implied-in-fact contract theory in reviewing the plaintiff's claim that FAR

1.102(b)(3) and 1.102-2(c) were violated when DOE cancelled the solicitation – a claim

over which the court has jurisdiction, as discussed above.  In fact, the venerable history

and affirmative duties associated with the implied-in-fact contract theory in the bid protest

context help instruct the court as to what standards of review to apply, and how to apply

them, for claims alleging violations of FAR 1.102(b)(3) and 1.102-2(c), such as those in

this case.

### 1.    History of the Implied-in-Fact Contract Theory in the Bid Protest Context

Prior to the passage of the ADRA in 1996, "the Court of Federal Claims'

jurisdiction over a bid protest was predicated on the implied contract between the

Government and prospective bidders to treat the bidder's proposal fairly, equally, and

consistently with the agency's solicitation of bids." L-3 Commc'ns Integrated Sys., L.P. v.

United States, 79 Fed. Cl. 453, 461 (2007) (citing Keco Indus., Inc. v. United States, 192

Ct. Cl. 773, 780 (1970); Heyer Prods. Co. v. United States, 147 Ct. Cl. 256 (1959)).

With the passage of the ADRA, however, the following language was inserted into the

Tucker Act as 28 U.S.C. § 1491(b)(1), thereby "clarifying the Court of Federal Claims' bid

protest jurisdiction," Impresa, 238 F.3d at 1332:

the Unite[d] States Court of Federal Claims . . . has jurisdiction to render

judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement[,] . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1).

The Federal Circuit has twice declined to rule on the question of whether the implied contract theory survives as part of the Court of Federal Claims' bid protest jurisdiction after the ADRA.  Impresa, 238 F.3d at 1332 n.6 ("Although it has been argued that the implied contract theory survives the 1996 amendment, see Frederick W. Claybrook, Jr., The Initial Experience of the Court of Federal Claims in Applying the Administrative Procedure Act in Bid Protest Actions: Learning Lessons All Over Again, 29 Pub. Cont. L.J. 1, 15-17 (1999), we need not decide this issue."); Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1081 n.9 (Fed. Cir. 2001) ("Similar to the Impresa court, 238 F.3d at 1332 n. 6, we decline to address whether implied contract theory survives the ADRA.").

>    **2.     Although an Implied Contract Is No Longer Needed As a Basis for Bid Protest Jurisdiction, the Theory Survives as Grounds for Challenging Agency Conduct Actionable Under 28 U.S.C. § 1491(b)(1), Including Cancellation of a Negotiated Procurement.**

While the Federal Circuit has declined to address the issue, the Court of Federal Claims has repeatedly addressed the question of whether an implied contract theory of good faith and fair dealing in the procurement context survives the enactment of the ADRA.  Various judges have ruled in different ways.  This court adopts the reasoning

outlined in a number of these cases, to the effect that,

> [a]lthough the ADRA obviated the need to base the COFC's protest <u>jurisdiction</u> on a breach of this implied-in-fact contract to consider bids fairly, the statute in no way eliminated a protestor's ability to challenge arbitrary and capricious conduct, such as bias or an unfair evaluation, which would also constitute a breach of the implied contract of fair dealing. . . . <u>Whether conduct be characterized as an arbitrary and capricious agency action or a breach of the implied duty to consider proposals fairly, such conduct is actionable in a bid protest.</u>

<u>L-3 Commc'ns</u>, 79 Fed. Cl. at 461-62 (first emphasis in original) (<u>citing, e.g.</u>, <u>Hunt Bldg. Co. v. United States</u>, 61 Fed. Cl. 243, 273 (2004) ("This Court's bid protest jurisdiction is no longer premised on the theory of the breach of an implied-in-fact contract. Nonetheless, it has long been held and is still recognized that the issuance of a competitive solicitation which generates responsive offers gives rise to an implied contract of fair dealing."); <u>Unified Architecture & Eng'g, Inc. v. United States</u>, 46 Fed. Cl. 56, 60-61 (2000), <u>aff'd</u>, 251 F.3d 170 (Fed. Cir. 2000) (table));[20] <u>see also</u> <u>Biltmore Forest Broad. FM, Inc. v. United States</u>, 80 Fed. Cl. 322, 334 (2008) ("With the enactment of ADRA, it was no longer necessary for an unsuccessful bidder to base the court's protest jurisdiction on a breach of an implied contract to consider bids fairly, but the statute enables a protestor to challenge arbitrary and capricious conduct in the context of a contract award –

---

[20]In <u>SKJ & Associates, Inc. v. United States</u>, 67 Fed. Cl. 218, 225-26 (2005), the court found that because of the ADRA, "the implied-in-fact contract theory no longer serves as a basis of recovery for bid protest actions." In <u>L-3 Communications</u>, the court "interpret[ed] <u>SKJ</u> . . . to mean that the breach of the implied-in-fact contract is no longer necessary as a predicate for this Court's bid protest jurisdiction, not to eliminate this theory as a basis for recovery." <u>L-3 Commc'ns</u>, 79 Fed. Cl. at 461 n.17.

the same cause of action previously considered under the rubric of a breach of an implied

contract." (citing L-3 Commc'ns, 79 Fed. Cl. at 453)).  In other words,

> [t]o state that [28 U.S.C. §] 1491(b)(1) supersedes the implied-contract theory
> of bid protest jurisdiction under [28 U.S.C. §] 1491(a)(1) is merely to say that,
> because [28 U.S.C. §] 1491(b)(1) encompasses all claims that could have been
> brought under the former statute and more, it obviates the need for the
> implied-contract theory.

Lion Raisins, Inc. v. United States, 52 Fed. Cl. 115, 120 (2002) (concluding that

"Plaintiff's bid protest claim thus must be brought under 28 U.S.C. § 1491(b)"); see also

HWA, Inc. v. United States, 78 Fed. Cl. 685, 697 (2007) (evaluating an implied contract

claim under 28 U.S.C. § 1491(b)(1)); Hamilton Sundstrand Power Sys. v. United States,

75 Fed. Cl. 512, 516 (2007) (Even after the ADRA, "a contracting agency must treat all

offerors equally, evaluating proposals evenhandedly against common requirements and

evaluation creiria." (internal quotation omitted)).  Thus, the court now finds that, although

28 U.S.C. § 1491(b) is the source for this court's bid protest jurisdiction following the

passage of the ADRA, that provision nonetheless encompasses a theory of recovery on the

basis of breaches of the implied contract to fairly and honestly consider bid proposals.[21,22]

In this case, where the plaintiff has challenged the agency's decision to cancel a negotiated procurement, the court finds that the implied-in-fact contract theory survives the ADRA by fitting within the ambit of the requirements to act with integrity, fairness, and openness and to treat bidders fairly under FAR 1.102(b)(3) and FAR 1.102-2(c)(3), over which the court has jurisdiction under 28 U.S.C. § 1491(b)(1), as discussed above. Here, the plaintiff's claims of breach of implied-in-fact contract and violations of FAR 1.102(b)(3) and 1.102-2(c) are virtually indistinguishable. The plaintiff's implied-in-fact contract theory challenges DOE's conduct as arbitrary and capricious, alleging that DOE failed to consider the plaintiff's proposal fairly when it decided to cancel the procurement and allow the incumbent to continue to complete the work. Likewise, the plaintiff claims that DOE did not "[c]onduct business with integrity, fairness, and openness" as required

---

[21]This analysis comports with the legislative history of the ADRA, which contains no references whatsoever to elimination of implied contract claims. See, e.g., 142 Cong. Rec. S6156-57, 1996 WL 315422 (June 12, 1996); H.R. Rep. No. 104-841, 104th Cong., 2d Sess. 9-10 (1996). In the absence of any expressed intention by Congress to eliminate claims that bid proposals were not fairly and honestly considered, the court is loath to rule that such claims were meant to escape review after the ADRA, especially given the considerable jurisprudence regarding such claims in this court and, as discussed in more detail below, the requirements in FAR 1.102(b)(3) and 1.102-2(c)(3) to treat bidders with integrity, fairness, and openness.

[22]In a prior opinion, Block v. United States, 66 Fed. Cl. 68, 77 (2005), this court denied the plaintiff's implied-in-fact contract claim that his unsolicited proposal had not been treated fairly, finding that "[e]ven if the court were to assume that this implied-in-fact contract theory survives, the court finds that the plaintiff's implied-in-fact contract claim must be dismissed because . . . the theory has not been extended to cases involving unsolicited proposals." Unlike the present case, Block presented a scenario in which the plaintiff submitted a noncompetitve, unsolicited proposal, to which the implied-in-fact theory or claim had no application.

by FAR 1.102(b)(3) (which, in turn, invokes the associated requirement in FAR 1.102-2(c)(3) that "[a]ll contractors and prospective contractors shall be treated fairly and impartially") when it decided, without a rational basis, to cancel the procurement and allow the incumbent to continue to complete the work.  Thus, the plaintiff's "claim of a breach of the implied duty to consider its proposal fairly and honestly is quintessentially a challenge to" the integrity, fairness, and openness of the Federal Acquisition System, and likewise to the fair and impartial treatment of contractors and prospective contractors.  See L-3 Commc'ns, 79 Fed. Cl. at 462; see also Unified Architecture, 46 Fed. Cl. at 61 ("[I]t is unnecessary . . . to consider plaintiff's breach of implied-in-fact contract claim separately and independently from plaintiff's other claims" because "[t]he very essence of plaintiff's bid protest is that its bid was not 'fairly and honestly' considered.").  Accordingly, whether the plaintiff's claim alleges violations of FAR 1.102(b)(3) and FAR 1.102-2(c) or breaches of the implied contract to consider bids fairly and honestly, "such conduct is actionable in a bid protest."  See L-3 Commc'ns, 79 Fed. Cl. at 462.

Thus, although jurisdiction in this case is based on the "violation of a statute or regulation" prong of 28 U.S.C. § 1491(b)(1), specifically on violations of FAR 1.102(b)(3) and 1.102-2(c), the ADRA does not limit the theories on which the plaintiff may base its objection to the alleged lack of integrity, fairness, and openness thereunder, and therefore the plaintiff is not precluded from bringing its implied-in-fact contract claim.[23]  See L-3

_____

[23]Accordingly, the court rejects the government's attempt to distinguish L-3 Communications and Unified Architecture on the grounds that jurisdiction in those cases rested

Commc'ns, 79 Fed. Cl. at 462.

> **C.      This Court Has Jurisdiction to Consider the Violations of FAR 19.502-2(b) Alleged by the Plaintiff.**

The court also rejects the government's argument that this court lacks jurisdiction to consider the plaintiff's claim under FAR 19.502-2(b).  As noted above, FAR 19.502-2(b) provides that the CO "shall set aside any acquisition over $100,000 for small business participation when there is a reasonable expectation that (1) offers will be obtained from at least two responsible small business concerns . . . ; and (2) award will be made at fair market prices."  Here, the plaintiff alleges that DOE violated FAR 19.502-2(b) when it cancelled the small business set-aside solicitation and allowed the incumbent large business contractor to perform the work that had been included therein.  The government argues that this court lacks jurisdiction to consider the alleged violation of FAR 19.502-2(b) because the provision "does not mandate termination of contracts already being performed[, in this case, the large business incumbent's contract,] to resolicit the same work from small businesses," and because the provision "addresses only the decision to set aside acquisitions," not the decision to cancel, which the government argues is the only agency decision at issue in this case.  Def.'s Mot. at 15.

However, the government's argument regarding FAR 19.502-2(b) conflates the merits of whether the provision was violated in this case with the jurisdictional question of

---

on the "award" prong of 28 U.S.C. § 1491(b)(1), whereas in the negotiated procurement cancellation context, the only possible jurisdictional basis is the "violation of statute or regulation" prong, which the government argues is lacking here.

whether the court may consider whether it was violated.[24]   Determining whether the

provision prohibited the government's conduct in deciding to cancel the small business

set-aside and instead allow the large business incumbent to complete the work requires a

resolution on the merits of the plaintiff's FAR 19.502-2(b) claim.[25]   From a jurisdictional

standpoint, however, the claimed violation of FAR 19.502-2(b) constitutes an "alleged

violation of statute or regulation in connection with a procurement or a proposed

procurement" which the court may consider pursuant to 28 U.S.C. § 1491(b)(1).[26]   In light

of the Federal Circuit's holding that the phrase "in connection with" in 28 U.S.C. §

1491(b)(1) is "very sweeping in scope," Ramcor, 185 F.3d at 1288 ("As long as a statute

has a connection to a procurement . . . , an alleged violation suffices to supply

jurisdiction."), the court finds that it has jurisdiction to consider the plaintiff's claim that

FAR 19.502-2(b) was violated.

---

[24]The government asserts in a footnote that, if the court finds subject matter jurisdiction over the plaintiff's alleged FAR violation claims, then the claims should be dismissed for failure to state a claim under RCFC 12(b)(6) "for identical reasons."  Def.'s Mot. at 11 n.1.

[25]The court rejects the government's assertion that FAR 19.502-2(b) cannot be applied in a cancellation scenario.  See Benchmade Knife Co., Inc. v. United States, 79 Fed. Cl. 731, 737-38 (2007) (finding that FAR 19.502-2(b) was not violated when an agency cancelled a solicitation that was set aside for small businesses and issued a new solicitation on an unrestricted basis because it rationally determined that there was only one small business manufacturer who could be expected to submit a proposal).

[26]Though the government asserts, as with FAR 1.102, that FAR 19.502-2(b) is not mandatory, see Def.'s Mot. at 11, the court finds that FAR 19.502-2(b), which states that the CO "shall set aside" certain acquisitions, is on its face a mandatory provision of the FAR, though the "reasonable expectation" standard therein affords the CO some leeway in complying with it.  FAR 19.502-2(b) (emphasis added).

**D.    Pursuant to 28 U.S.C. § 1491(b)(4), the Plaintiff's Claims are Reviewable Under an "Arbitrary, Capricious, an Abuse of Discretion, or Not Otherwise in Accordance with Law" Standard.**

As discussed above, the court rejects the government's argument that "cancellation of a negotiated procurement is an act committed to agency discretion for which there are <u>no</u> legal standards to apply."  Def.'s Reply at 16 (emphasis added).  Nonetheless, the court does find that challenges to such cancellations are to be reviewed according to very deferential standards.  As an initial matter, 28 U.S.C. § 1491(b)(4) directs that, "[i]n any <u>action under this subsection</u> [28 U.S.C. § 1491(b)], the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."[27]  28 U.S.C. § 1491(b)(4) (emphasis added).  Thus, 28 U.S.C. § 1491(b)(4) dictates that the APA standard is to be applied in <u>any</u> action over which the court has jurisdiction under 28 U.S.C. § 1491(b) – <u>irrespective of which prong of 28 U.S.C. § 1491(b)(1) it is brought under</u>.  Moreover, the statute specifies that, in any action over which the court determines it has jurisdiction under 28 U.S.C. § 1491(b), the court reviews <u>the agency's decision</u> according to the APA standard.  Thus, 28 U.S.C. § 1491(b)(4) dictates that, even for cases such as this in which the plaintiff is challenging the agency's decision to cancel under the "violation of statute or regulation" prong of 28 U.S.C. § 1491(b)(1), once the court determines it has jurisdiction to consider the challenge, the court must review the agency's

---

[27]As noted above, the standard from 5 U.S.C. § 706 to which 28 U.S.C. § 1491(b)(4) refers is the "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law" standard in 5 U.S.C. § 706(2)(A).  <u>See</u> PGBA, 389 F.3d at 1225-27.

decision to cancel to determine whether it is arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law.[28]

As noted above, the Federal Circuit has held that, in applying the APA to a bid protest action, an agency's decision "'may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" CHE Consulting, ___ F.3d ____, 2008 WL 5397566 at *2 (quoting PGBA, LLC, 389 F.3d at 1225).  In determining whether the decision had a rational basis, reviewing courts must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, . . . and the disappointed bidder bears a heavy burden of showing that the [agency's] decision had no rational basis."  Impresa, 238 F.3d at 1333 (internal quotations omitted).  To show a violation of a regulation or procedure, "a claimant must show 'a clear and prejudicial violation of applicable statutes or regulations.'"  Galen Med. Assocs., 369 F.3d at 1331 (quoting Banknote, 365 F.3d at 1351).[29]

_____

[28]Accordingly, the government is incorrect in asserting that the only possible standard of review for cases brought under the "violation of a statute or regulation" prong of 28 U.S.C. § 1491(b)(1) is ultra vires.

[29]The court notes that these are the same standards that were historically applied to cancellations of negotiated procurements brought under the court's implied contract jurisdiction prior to the ADRA.  See, e.g., 126 Northpoint Plaza Ltd. P'ship v. United States, 34 Fed. Cl. 105, 107 (1995) ("The parties must show, by clear and convincing evidence, that either: (1) the government officials involved in the procurement process lacked a rational or reasonable basis for their cancellation decision; or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations." (citations omitted)).

The court further notes that, post-ADRA, review of the agency's actions pursuant to the APA's "arbitrary and capricious" standard, as set forth in 28 U.S.C. § 1491(b)(4), naturally

In reviewing the agency's decision to cancel, the court is mindful that cancellation in the negotiated procurement context is given a great degree of discretion.  See Cygnus Corp., Inc. v. United States, 72 Fed. Cl. 380, 385 (2006) ("[C]ancellation of an RFP is . . . given a great degree of discretion.");[30] see also AT&T, 307 F.3d at 1379 ("[I]n a negotiated procurement, as in this case, this court has held that the regulations entrust the

---

encompasses an analysis of whether the implied-in-fact contract to consider bids fairly and honestly has been breached.  Specifically, "'[t]he government is said to breach the implied contract if its consideration of offers is found to be arbitrary and capricious toward the bidder-claimant.'"  Hunt Bldg. Co., 61 Fed. Cl. at 273 (emphasis added) (quoting Southfork Sys., Inc. v. United States, 141 F.3d 1124, 1132 (Fed. Cir. 1998)).

    Accordingly, in these unique circumstances, in which the plaintiff is alleging violations of the FAR provisions requiring integrity, fairness, and openness (FAR 1.102(b)(3)), including fair and honest treatment of all contractors and prospective contractors (FAR 1.102-2(c)(3)), the standard of review of such violations amounts to a rational basis test.  As discussed supra, the court finds that these provisions of FAR 1.102 incorporate the historical standards for the implied contract theory of fair and honest consideration of all proposals, and the test for a breach of that implied contract has historically been the same test currently applied in all bid protest cases under 28 U.S.C. § 1491(b) – lack of rational basis or clear and prejudicial statutory or regulatory violations.  Thus, to determine whether FAR 1.102(b)(3) and 1.102-2(c) have been violated, the court must determine whether the procurement official's decision lacked a rational basis and whether any other statutes or regulations were violated.

    [30]A number of GAO decisions have found that, in contrast to sealed bidding, in cancelling a negotiated procurement, "the contracting officer need only have a reasonable basis for cancellation after receipt of proposals, as opposed to the 'cogent and compelling' reason required for cancellation of a solicitation after sealed bids have been opened[,] . . . because in sealed bidding competitive positions are publicly exposed as a result of the public opening of bids, while in negotiated procurements there is no public opening."  Cantu Servs., Inc., B-219998.9, 1989 WL 240549, *1 (Comp. Gen. 1989) (citing Cadre Technical, Inc., et al., B-221430 et al., 1986 WL 63252 (Comp. Gen. 1986); Allied Repair Serv., Inc., B-207629, 1982 WL 26715 (Comp. Gen. 1982)); see also Steven W. Feldman, Government Contract Guidebook § 6:8 (4th ed. Jan. 2008) ("Generally, the cancellation of an RFP is difficult to challenge because cancellation is a matter of Contracting Officer discretion.  Unlike rejection of all bids after bid opening in a sealed bid procurement, offers in a negotiated procurement have not been publicly exposed.  For this reason, no requirement exists for a compelling reason to justify RFP cancellation as opposed to an [Invitation for Bids] cancellation." (footnotes omitted)).

contracting officer with especially great discretion, extending even to his application of procurement regulations." (citing LaBarge Prods. v. West, 46 F.3d 1547, 1555 (Fed. Cir. 1995); Burroughs Corp. v. United States, 223 Ct. Cl. 53, 65 (1980))).

## II.     The Administrative Record Demonstrates that the Cancellation of the Amended Solicitation Was Not Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law.

Having established that the court has jurisdiction over the plaintiff's claims, the court finally turns to the merits of those claims.  As discussed above, under the APA standard of review set forth in 28 U.S.C. § 1491(b)(4), to determine whether FAR 1.102(b)(3) and 1.102-2(c) have been violated, including whether the implied-in-fact contract to consider bids fairly and honestly has been breached, the court must determine whether the agency had a rational basis for its decision to cancel the solicitation, including a coherent and reasonable explanation of the exercise of its considerable discretion in doing so.  In addition, the court must determine whether the agency's actions constituted a clear and prejudicial violation of FAR 19.502-2(b).  For the reasons set forth below, the court finds that the administrative record supports judgment in the government's favor, because the cancellation decision was supported by a rational basis and the agency did not violate any of the FAR provisions raised by the plaintiff.[31]

---

[31]As noted above, the plaintiff's argument that the implied-in-fact contract of fair dealing was violated (Count III) is based on virtually the same reasoning as its argument that FAR 1.102(b)(3) and 1.102-2(c), requiring integrity, fairness, and openness, were violated (Count I). Accordingly, the court will consider the merits of the plaintiff's Counts I and III together.

**A.      The Cancellation Decision Did Not Violate FAR 1.102(b)(3), FAR 1.102-2(c), or the Implied Contract to Fairly Consider Proposals, Because the Agency Had a Rational Basis for Its Decision to Cancel the Amended Solicitation.**

      **1.      The Plaintiff's Position**

In its cross-motion for judgment on the administrative record, the plaintiff argues that DOE lacked a rational basis for its cancellation decision, thereby violating the requirements of FAR 1.102(b)(3) and FAR 1.102-2(c) and the implied-in-fact contract of fair and honest consideration of proposals.  The plaintiff argues that all of the factors DOE identified as weighing in favor of cancellation – delays (including the protraction of the EIS process), reduced budget, stakeholders' concerns, and cost effectiveness – were either known to DOE at the time that the amended solicitation was issued in April 2005, such that they could not reasonably be used to justify a decision to cancel that solicitation in December 2005, or the factors were not supported by the record.

Specifically, the plaintiff argues that, because the terms of the amended solicitation issued in April 2005 expressly allowed for the possibility that DOE might not proceed with CLIN 2, it was not reasonable for DOE to base its decision to cancel on delays in deciding whether to go forward with CLIN 2, nor on the increasing likelihood that CLIN 2 would be dropped.  The plaintiff points to the memo from Mr. Golan to DOE's Inspector General in May 2005, to show that the way the amended RFP was structured – "such that only the deactivation [(CLIN 1)] . . . is authorized for immediate execution with a decision point after the issuance of a [ROD] under the NEPA process that will determine what the end

state will be . . . before committing to the final decommissioning phase [(CLIN 2)] of this project," AR Ex. B – put DOE and the offerors on notice that CLIN 2 might never materialize.  Given that understanding, the plaintiff contends, DOE's determination that it would need to amend the solicitation and allow offerors to revise their proposals to reflect the delay in deciding on CLIN 2 or the increased likelihood of dropping CLIN 2 was irrational.

Similarly, the plaintiff argues that the "decision point" in the amended solicitation addressed the concerns of stakeholders regarding higher priority projects, as evidenced in Mr. Golan's memo.  AR Ex. B ("This decision point also allows us to consider other factors such as the Hanford Site budget and cleanup priorities at that time (the issue raised by the State of Washington and the [EPA]) before committing to the final decommissioning phase of this project. . . . [EPA] and State of Washington Department of Ecology . . . indicated that our approach addresses their concerns.").  Therefore, the plaintiff argues, the agency could not reasonably rely upon those concerns as a basis for later cancelling the amended solicitation, as DOE did in its SSO memo.

With regard to the budget reduction for FY 2007, the plaintiff asserts that it "was not reasonably a surprise to anyone given the then-current world circumstances and status of discussions on the federal budget that occurred throughout calendar year 2005."  Pl.'s Cross-Mot. at 15.  The plaintiff further argues that because DOE went on to spend $90 million on the large business contractor to continue the deactivation work after the

solicitation was cancelled, a reduction in DOE's overall EM budget was not a reasonable justification for cancellation of the amended solicitation.

Likewise, the plaintiff contends that the administrative record provides no support for the agency's determination that, by the time an award was made on the amended solicitation, "the residual work scope and period of performance [would have been] so small as to be not cost effective for award." AR 6. The plaintiff argues that any of the small business offerors would have been more cost-effective, as evidenced by the fact that their proposed prices were less than the government's estimate of the cost of the original solicitation of $350 million. The plaintiff asserts that, "[i]ndeed, a four-year (to date) performance period cannot reasonably be considered small and an offer to perform at two-thirds of the government estimate cannot reasonably be considered not [to] be cost effective when a budget of $90 million has been proposed and DOE is admittedly having its budget reduced." Pl.'s Reply at 11-12.

### 2.     The Government's Position

The government counters that the plaintiff's arguments are unsupported by the record evidence and that the information learned by DOE in the fall of 2005 justified the decision to cancel the solicitation in December 2005. In particular, the government argues that, contrary to the plaintiff's assertions, a review of the record demonstrates that, in late October 2005, DOE learned of delays in the EIS beyond those contemplated at the time of the amended solicitation, namely those arising out of the likely integration of the FFTF

EIS with a comprehensive groundwater EIS.  According to the government, because of the

extra delay in the EIS, DOE determined that it could not meet the December 2006 deadline

in the amended RFP for a decision on CLIN 2 and that it was increasingly likely that CLIN

2 would not go forward at all.  The government further argues that, "because in the various

bids all of the proposed contractors had acted as if they were going to be able to begin

decommissioning in the beginning of 2007 – that was how the various bids were priced,

that was how the logistics were planned – . . . it became apparent that even if DOE was to

go forward, all of the information in those bids would have to be amended somehow."  Tr.

of Oral Arg. 43:7-14.  In addition, the government argues that it was not until November

2005 that DOE learned that their FY 2007 budget was most likely going to be cut by

sixteen percent from their FY 2006 budget.  According to the government, the record

supports DOE's determination that, with the reduction in funding, the need to spend the

limited funds on higher priority Hanford Site EM projects became of much greater

concern.

  With regard to the plaintiff's contention that continuing with the incumbent

contractor may have been more expensive, the government argues that it is impermissible

to rely on evidence of what was spent after the amended solicitation was cancelled to

determine whether the cancellation decision was reasonable, because that evidence was

not before the SSO when the decision was made.  Moreover, the government argues that

because there is no evidence in the record on which to base a comparison of the scope of

work in the solicitation with the scope of the work completed by the incumbent contractor,

it is impossible to simply compare expenditures on the assumption that the scopes of work

were the same.

The government concludes that, based on the information that was before DOE at

the time the decision was made, the agency's decision to cancel the amended solicitation

should be upheld.

> **3.      The Record Shows that the Reasons for Cancellation Relied Upon
> by the Agency Were Based on Information that Came to Light
> After the Amended Solicitation Was Issued in April 2005.**

Having examined the administrative record, the court finds that DOE had a rational

basis for its decision to cancel the amended solicitation and continue with the incumbent

contractor under an existing contract.  The court finds, consistent with the government's

reading of the record, that the decision to cancel was based on new information learned

after the amended solicitation was issued in April 2005, specifically the unanticipated

delays in the EIS and the reduction of DOE's budget.

> **a.      DOE Learned of the Delays Due to EIS Integration in
> October 2005.**

First, the court finds that it was not irrational for DOE to determine that, as a result

of the additional delays in issuing the EIS, of which the record shows DOE learned in late

October 2005 (approximately six months after the amended RFP was issued in late April

2005), the solicitation would have to be amended again and the bid proposals revised to

reflect the delays in deciding about CLIN 2, as well as the increasing unlikelihood of

proceeding with CLIN 2 at all.  Though the plaintiff is correct that the amended RFP

allowed for the possibility that CLIN 2 might not go forward, the effect of the new

information regarding the EIS was more complex than simply dropping the second CLIN

from the existing RFP.  Rather, the record demonstrates that the new information threw off

the timing and pricing of the proposals, as well as DOE's evaluation of those elements of

the proposals.  Specifically, when DOE learned that the FFTF EIS was likely to be

integrated into a more comprehensive EIS, and that even if a separate FFTF EIS were

allowed, the December 2006 deadline specified in the amended RFP for deciding whether

to execute CLIN 2 still could not be met, AR 4-5, DOE explained:

> Offerors have developed solutions and priced their propos[als] based on this
> commitment.  All offerors' proposals appear to anticipate the commencement
> of some decommissioning work (CLIN 2) before deactivation (CLIN 1) would
> be complete.  Depending on the offeror, the cost of CLIN 2 ranges between
> approximately 30% to 45% of the total proposed contract price.  It is now clear
> that DOE will not be able to decide whether to execute CLIN 2 by the date in
> the RFP. . . . [Pulling the] FFTF EIS . . . into the expanded Tank Closure EIS
> . . . would require that demobilization [(decommissioning)] occur after the
> deactivation work scope is complete, awaiting a final end-state decision
> sometime in 2008. . . . Consequently, the Government would need to amend the
> solicitation and allow offerors to revise their proposals, then reevaluate the
> revised proposals, and possibly conduct additional negotiations. Consequently,
> if the procurement proceeds, award could not occur before spring of 2006.

AR 5; see also AR 3 ("DOE fully expected to issue CLIN 2 and, accordingly, the costs of

CLIN 2 have been evaluated as part of total proposed cost" in evaluating the proposals

submitted.).  The court finds that DOE rationally concluded that, because the timetables

and pricing submitted by the offerors were partly dependent on the timing of CLIN 2

specified in the amended solicitation, further solicitation amendments and proposal revisions would be required in order to properly evaluate the proposals based on the new information regarding that timing.

The court further finds that it was not irrational for DOE to determine, in light of these unanticipated delays in the EIS, that the steady progress made by the incumbent on deactivation would make the residual scope of work so small as to not be cost effective by the time an award could be issued.  The SSO memo stated that,

> [d]ue to a greatly reduced scope from the existing RFP statement of work, and unavoidable delays in reaching a decision on CLIN 2 from the date stated in [the] current RFP, DOE cannot award the contract without substantial revisions to the RFP, which themselves may be so material as to require canceling the solicitation.  The modification of the RFP to redefine the scope and establish a realistic timeframe for CLIN 2 would entail significant delays in award, which render the residual work scope and period of performance to be so small as to be not cost effective for award.

AR 6.  The court finds that DOE had a rational basis to conclude that the additional, unanticipated delays in the EIS process would allow so much additional work to be completed as to reduce the scope of work to a point where it would not be cost effective to go forward after another round of amendments and revisions.[32]

---

[32]With regard to the plaintiff's argument that the small business offerors would have been more cost effective because their proposals were priced lower than the government's $350 million estimate, the court agrees with the government that the $350 million estimate, which was developed before the solicitation was amended to consist of two separate CLINs, AR 3, cannot meaningfully be compared to the proposals submitted in response to the amended solicitation. Moreover, the FFTF Decision Table reflects that the cost of completing only CLIN 1 would have been the same for a small business offeror as for the incumbent contractor: $46 million per year from 2008-2010.  AR 12.

>    **b.**    **DOE Learned of the Significant Reduction in its FY 2007**
>             **Budget in November 2005.**

Next, the court finds that it was not irrational for DOE to conclude, based on the

budget reduction of which the record shows DOE learned in November 2005 (more than

six months after the amended RFP was issued in April 2005), that the limited funds would

need to be shifted toward higher priority Hanford EM projects and away from the FFTF

closure projects.  Though the plaintiff is correct that DOE knew about their stakeholders'

concerns regarding higher priority projects at Hanford at the time the amended solicitation

was issued, see AR Ex. B, the court finds that the significant budget reduction reasonably

made the need to prioritize other, more critical EM projects at the Hanford Site more

pressing.

Specifically, the record shows that the amended RFP projected that DOE would

provide $44 million annually to fund the project through contract completion.  AR 4.

However, in November 2005, DOE procurement officials learned of a sixteen-percent

reduction in the OMB passback level for EM funding in FY 2007 from the FY 2006

appropriations level.  Id.  Meanwhile, costs had "escalated dramatically for more critical

EM projects at Hanford, such as K Basin's sludge, Waste Treatment Plant, and plutonium

secure storage."  Id.  Though the plaintiff correctly notes that the amended RFP shifted the

final determination regarding CLIN 2 to a later "decision point," allowing DOE to

consider stakeholder concerns about such higher priority projects before committing to

CLIN 2, see AR Ex. B, the news in November 2005 of a budget reduction that was not

contemplated in the RFP reasonably threw the completion of <u>both</u> CLIN 1 and CLIN 2, as

those phases were defined in the amended RFP, into doubt.  As the SSO memo stated, the

higher priority projects were "experiencing cost growth, such that they [would] require a

higher proportion of EM Hanford funding," meaning that "DOE [would] not have

sufficient funds to support FFTF at the level anticipated in the revised RFP issued in

April" 2005.  AR 4.  Accordingly, the SSO memo stated that "the cost of FFTF will need

to [be] either reduced or stretched out over a longer period of time, and the scope of work

<u>both</u> for deactivation and decommissioning redefined accordingly."  AR 5 (emphasis

added).  The memo further noted that "[c]ompletion of both deactivation and

decommissioning work scopes at this time is very unlikely because of budget constraints

and the need to shift funds to higher priority projects.  Therefore, <u>only the minimum</u>

<u>deactivation</u> consistent with a long term, low cost surveillance mode should be pursued."

AR 6 (emphasis added).

Thus, the court finds that DOE had a rational basis for determining that changes to

the scope of work set forth in the amended RFP would be necessary, in light of news of

the budget reduction in November 2005.[33]  In turn, the court finds that DOE acted

rationally in deciding to cancel the solicitation and allow the incumbent to complete the

"minimum deactivation" required, given DOE's determination that the scope of work

_____

[33]The plaintiff's unsupported assertion that DOE should have known a budget reduction
was a possibility, given the "then-current world circumstances and status of discussions on the
federal budget that occurred throughout calendar year 2005," Pl.'s Cross-Mot. at 15, is outside
the administrative record in this case.

remaining after another round of amendments and revisions would be too small to be cost effective, as discussed above.[34]

In sum, the court agrees with the government that the administrative record shows that, based on the unanticipated delays in the EIS and the significant reduction in DOE's FY 2007 budget, both of which came to light after the amended RFP was issued, DOE rationally decided to cancel the solicitation and allow the incumbent contractor to continue, rather than amend the solicitation and revise the bids, by which time the incumbent would have made significant progress toward deactivation.

**4.     The Decision Reflected the Agency's Consideration of the Impacts the Cancellation Would Have on the Bidders.**

The court notes that, while most of the plaintiff's briefing on the merits of the cross-motions for judgment of the administrative record focuses on the alleged lack of a rational basis for the agency's decision, the plaintiff's allegation that "what is present in this case is an apparent decision to go with the big contractor to the direct detriment of small businesses and the taxpayer, while creating the illusion that a fair and open decision was made," Pl.'s Reply at 12, hints at an argument that the cancellation decision was pretextual in some way. An agency's explanation for its decision to cancel may not be

---

[34]Because the court agrees with the government that the scope of its review in this case is limited to the information that was before the decision maker at the time the decision was made, as noted above, see, e.g., Great Lakes, 60 Fed. Cl. at 359, the court does not consider the plaintiff's argument that, because DOE has spent $90 million on deactivation work by the large business contractor since the solicitation was cancelled, the reduction in DOE's overall EM budget was not a reasonable justification for cancellation of the amended solicitation.

"merely a pretense" for another, improper motivation for cancelling, including those

"'reflecting personal predilections of administrative officials, whether ascribable to whim,

misplaced zeal, or impermissible influence,'" such as to avoid contracting with a particular

bidder.  126 Northpoint Plaza, 34 Fed. Cl. at 111-12 (quoting Parcel 49C Ltd. P'ship v.

United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994)); see also FAR 3.101-1 ("Government

business shall be conducted in a manner above reproach . . . , with complete impartiality

and with preferential treatment for none."); Superlative Techs., Inc., B-310489, 2008 WL

141852, *3 (Comp. Gen. 2008) ("[W]here a protestor has alleged that an agency's

rationale for cancellation is but a pretext, that is, the agency's actual motivation is to avoid

awarding a contract on a competitive basis or to avoid resolving a protest, we will closely

examine the reasonableness of the agency's actions in canceling the acquisition." (citations

omitted)).  However, a "strong presumption that government contract officials exercise

their duties in good faith" applies, and the plaintiff must meet a "high burden of proof" to

overcome that presumption.  Am-Pro Protective Agency, Inc. v. United States, 281 F.3d

1234, 1238-39 (Fed. Cir. 2002).

In this case, the plaintiff has not put forth any evidence to show that the agency

acted with improper motives in cancelling the solicitation and continuing with the

incumbent contractor.  To the contrary, the record in this case demonstrates that DOE, in

addition to having a rational basis for its actions, considered the impacts that cancellation

would have on the bidders.  The SSO memo explained that the decision to cancel was not

"reached casually or lightly" and stated that, "[i]n making this recommendation, the SSO has considered the costs expended by the small businesses that have participated in this procurement." AR 6. The Acquisition Objectives/Small Business Interests section of the FFTF Decision Table expressly contemplated that there would be a "large financial impact on small business offerors (bid and proposal costs, lost revenue)." AR 15. The SSO memo stated that, "[u]ntil very recently, the SSO fully expected to select one of those small businesses for award . . . ." Id. However, the SSO memo concluded that, "[u]nfortunately, . . . it is not in the Government's best interests to continue with this solicitation." Id. Thus, rather than demonstrating that DOE's motives were improper, the record reflects that DOE weighed its options in good faith and determined that, in spite of the unfortunate impacts on the offerors, cancellation of the solicitation was nonetheless in the government's best interest.

In conclusion, for the reasons set forth above, the court finds that DOE's actions did not violate FAR 1.102(b)(3) or FAR 1.102-2(c), nor did they constitute a breach of the implied contract to consider bids fairly and honestly.

### B.     The Cancellation Decision Did Not Violate FAR 19.502-2(b).

Finally, the court finds that the agency's conduct in this procurement process did not violate FAR 19.502-2(b), which, as noted above, requires the CO to "set aside any acquisition over $100,000 for small business participation when there is a reasonable expectation that (1) offers will be obtained from at least two responsible small business

concerns . . . ; and (2) award will be made at fair market prices." The court finds that where, as here, the decision to cancel the solicitation and allow the incumbent to continue working under an existing contract was rationally supported, and the plaintiff has not put forth any evidence that the decision was a pretext to avoid contracting with small businesses, the agency did not violate FAR 19.502-2(b) by not setting the work aside for small businesses.

       **1.**     **The Decision to Cancel the Small Business Set-Aside and Continue with the Incumbent Contractor Was Rational Given the Diminished Scope of Work Remaining.**

As discussed at length above, the court finds that the agency's decision to cancel the solicitation in this case and continue with the incumbent contractor was supported by a rational basis, notwithstanding the fact that the solicitation was a small business set-aside and the incumbent contractor was a large business, because the agency determined that the scope of the work remaining would be too small to make awarding a new contract cost effective. The agency in this case did not decide to cancel the small business set-aside and resolicit the work to award it to a large business contractor under a new contract, which would have given rise to a concern that the new contract should have been set aside for small businesses, depending on the circumstances. Cf. Benchmade Knife, 79 Fed. Cl. at 737-38 (finding that FAR 19.502-2(b) was not violated when an agency cancelled a solicitation that was set aside for small businesses and issued a new solicitation on an unrestricted basis because it rationally determined that there was only one small business

manufacturer who could be expected to submit a proposal).  Rather, the agency in this case simply continued to allow the large business incumbent to complete some of the work included in the solicitation <u>under an existing contract</u>, because it determined that there would not be enough work remaining by the time a new procurement could be awarded.

As the government correctly argues, FAR 19.502-2(b) does not mandate that existing contracts be retracted and given to small businesses.  <u>Cf</u>. <u>Greenleaf Const. Co.,</u> <u>Inc. v. United States</u>, 67 Fed. Cl. 350, 360-61 & n.19 (2005) (FAR 19.502-2(b) "only governs whether a procurement will be issued as a small business set aside.  It has no impact on issued solicitations.").  FAR 19.502-2(b) simply requires that, if the government decides to go forward with a new procurement, it must be done as a small business set-aside in certain specified circumstances.  Here, the agency decided <u>not</u> to go forward with the new procurement, and because the court finds that that decision was supported by a rational basis, the court finds, in turn, that FAR 19.502-2(b) was not violated in this instance.

**2.  The Plaintiff Has Not Put Forth Any Evidence that the Decision to Cancel Was a Pretext to Avoid Contracting with Small Businesses and Continue with the Large Business Incumbent.**

The court reiterates that this is not a case in which the plaintiff has put forth any evidence to show that agency's actions were a mere pretext for some improper motivation, such as to avoid contracting with small businesses in favor of a large business, which would undermine the goal of FAR 19.502-2(b) to set certain procurements aside for small

businesses.  Similar to the court's evaluation of the agency's decision under FAR

1.102(b)(3) and 1.102-2(c), the court finds with regard to FAR 19.502-2(b) that the record

shows that DOE considered its obligations to the small business community in weighing

its options, finding that continuing with the incumbent contractor would not "meet . . .

major small business objective[s]," thereby "plac[ing] greater pressure for small business

opportunities in future acquisitions," AR 15, but determining that that downside did not

outweigh the numerous reasons in favor of cancelling.  As noted above, the SSO memo

explained that the decision to cancel was not "reached casually or lightly" and stated that,

"[i]n making this recommendation, the SSO has considered the costs expended by the

small businesses that have participated in this procurement," AR 6 – a "large financial

impact" including "bid and proposal costs, [and] lost revenue."  AR 15.  Thus, the record

shows that, far from being a pretext to avoid contracting with small businesses and shirk

its obligations under FAR 19.502-2(b), the agency's decision to cancel the small business

set-aside was made in a good faith attempt to balance numerous competing concerns in the

face of unforeseen delays and significantly reduced funding.

## CONCLUSION

For the foregoing reasons, the government's motion to dismiss is **DENIED**, but the

government's motion for judgment on the administrative record is **GRANTED**.  In

addition, the plaintiff's motion for judgment on the administrative record is **DENIED**.

Accordingly, the clerk of the court is directed to enter judgment in favor of the

government.  Each party is to bear its own costs.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge